Ex Parte: In the Matter of William Wells, on a Petition for a Writ of Habeas Corpus.

18h 307
L-ed 421
8wa100
18wa166
93 23
99 601
100 375
110 653
5f 136
142 454
47f 719

The second article of the Constitution of the United States, section two, contains this provision, namely: "The President shall have power to grant reprieves and pardons for offences against the United States, except in cases of impeachment."

Under this power, the President can grant a conditional pardon to a person under sentence of death, offering to commute that punishment into an imprisonment for life. If this is accepted by the convict, he has no right to contend that the pardon is absolute and the condition of it void. And the court below was justifiable in refusing to discharge the prisoner, when the application was placed upon that ground.

The language used in the Constitution as to the power of pardoning, must be construed by the exercise of that power in England prior to the Revolution, and in the States prior to the adoption of the Constitution.

The manner explained in which it was exercised in England and in many of the States.

The language of the Constitution is such that the power of the President to pardon conditionally is not one of inference, but is conferred in terms; that language being to "grant reprieves and pardons," which includes conditional as well as absolute pardons.

The acceptance, by the convict, of the condition, was not given under duress in the legal acceptation of that term

This was a motion for a writ of *habeas corpus*, founded on a petition by Wells, setting forth the following circumstances, viz:—

That Wells was convicted of murder, at the December term, 1851, of the criminal court for the county of Washington, District of Columbia, and was sentenced by said court to be hanged on the 23d of April, 1852, on which said 23d of April, Mr. Fillmore, then President of the United States, granted "a pardon of the offence of which he was convicted, upon condition that he be imprisoned during his natural life, that is, the sentence of death is hereby commuted to imprisonment for life in the penitentiary at Washington."

That while under the constraint of duress of imprisonment and *duress per minas* he subscribed an acceptance of the pardon with the condition annexed.

That on the 18th of April, 1855, he applied to the circuit court of the District of Columbia, for a writ of *habeas corpus*, which was granted, and that court proceeded to inquire into the cause of his imprisonment.

That the circuit court decided that the President had power to commute the punishment of death, and remanded him to the penitentiary, where he has ever since been confined.

He therefore prayed this court to issue a writ of *habeas corpus*.

In this case, as in the case of *ex parte* Watkins, (7 Pet. 571,) it was admitted that all the facts existing in the case had been laid before the court, exactly as they would appear if the *habeas corpus* had been duly awarded and returned; so that the judgment which the court were called upon to pronounce, was precisely that which ought to be pronounced upon a full hearing upon the return to the writ of *habeas corpus;* and it was accordingly so argued at the bar.

It will be seen also by a reference to that case that the court decided that the judgment which was pronounced upon the petition of Mr. Watkins, was an exercise of appellate and not of original jurisdiction.

The petition for a *habeas corpus* was sustained by *Mr. Charles Lee Jones* for the petitioner, and opposed by *Mr. Cushing*, Attorney-General.

The subject is so fully discussed in the opinion of the court and the dissenting opinions of Mr. Justice McLean and Mr. Justice Curtis, that it is not thought necessary to give the arguments of counsel.

Mr. Justice WAYNE delivered the opinion of the court.

The petitioner was convicted of murder in the District of Columbia, and sentenced to be hung on the 23d of April, 1852. President Fillmore granted to him a conditional pardon. The material part of it is as follows : " For divers good and sufficient reasons I have granted, and do hereby grant unto him, the said William Wells, a pardon of the offence of which he was convicted—upon condition that he be imprisoned during his natural life ; that is, the sentence of death is hereby commuted to imprisonment for life in the penitentiary of Washington." On the same day the pardon was accepted in these words : " I hereby accept the above and within pardon, with condition annexed."

An application was made by the petitioner to the circuit court

of the District of Columbia, for a writ of *habeas corpus*. It was rejected, and is now before this court by way of appeal.

The second article of the constitution of the United States, section two, contains this provision : " The President shall have power to grant reprieves and pardons for offences against the United States, except in cases of impeachment."

Under this power, the President has granted reprieves and pardons since the commencement of the present government. Sundry provisions have been enacted, regulating its exercise for the army and navy, in virtue of the constitutional power of congress to make rules and regulations for the government of the army and navy. No statute has ever been passed regulating it in cases of conviction by the civil authorities. In such cases, the President has acted exclusively under the power as it is expressed in the constitution.

This case raises the question, whether the President can constitutionally grant a conditional pardon to a convicted murderer, sentenced to be hung, offering to change that punishment to imprisonment for life ; and if he does, and it be accepted by the convict, whether it is not binding upon him, to justify a court to refuse him a writ of *habeas corpus*, applied for upon the ground that the pardon is absolute, and the condition of it void.

The counsel for the prisoner contends that the pardon is valid, to remit entirely the sentence of the court for his execution, and that the condition annexed to the pardon, and accepted by the prisoner, is illegal. It is also said that a President granting such a pardon assumes a power not conferred by the constitution— that he legislates a new punishment into existence, and sentences the convict to suffer it ; in this way violating the legislative and judicial powers of the government, it being the province of the first, to enact laws for the punishment of offences against the United States, and that of the judiciary, to sentence convicts for violations of those laws, according to them. It is said to be the exercise of prerogative, such as the king of England has in such cases ; and that, under our system, there can be no other foundation, empowering a President of the United States to show the same clemency.

We think this is a mistake arising from the want of due consideration of the legal meaning of the word pardon. It is supposed that it was meant to be used exclusively with reference to an absolute pardon, exempting a criminal from the punishment which the law inflicts for a crime he has committed.

But such is not the sense or meaning of the word, either in common parlance or in law. In the first, it is forgiveness, release, remission. Forgiveness for an offence, whether it be one for which the person committing it is liable in law or otherwise.

Release from pecuniary obligation, as where it is said, I pardon you your debt. Or it is the remission of a penalty, to which one may have subjected himself by the non-performance of an undertaking or contract, or when a statutory penalty in money has been incurred, and it is remitted by a public functionary having power to remit it.

In the law it has different meanings, which were as well understood when the constitution was made as any other legal word in the constitution now is.

Such a thing as a pardon without a designation of its kind is not known in the law. Time out of mind, in the earliest books of the English law, every pardon has its particular denomination. They are general, special or particular, conditional or absolute, statutory, not necessary in some cases, and in some grantable of course. Sometimes, though, an express pardon for one is a pardon for another, such as in approver and appellee, principal and accessary in certain cases, or where many are indicted for felony in the same indictment, because the felony is several in all of them, and not joint, and the pardon for one of them is a pardon for all, though they may not be mentioned in it; or it discharges sureties for a fine, payable at a certain day, and the king pardons the principal; or sureties for the peace, if the principal is pardoned, after forfeiture. We might mention other legal incidents of a pardon, but those mentioned are enough to illustrate the subject of pardon, and the extent or meaning of the President's power to grant reprieves and pardons. It meant that the power was to be used according to law; that is, as it had been used in England, and these States when they were colonies; not because it was a prerogative power, but as incidents of the power to pardon, particularly when the circumstances of any case disclosed such uncertainties as made it doubtful if there should have been a conviction of the criminal, or when they are such as to show that there might be a mitigation of the punishment without lessening the obligation of vindicatory justice. Without such a power of clemency, to be exercised by some department or functionary of a government, it would be most imperfect and deficient in its political morality, and in that attribute of deity whose judgments are always tempered with mercy. And it was with the fullest knowledge of the law upon the subject of pardons, and the philosophy of government in its bearing upon the constitution, when this court instructed Chief Justice Marshall to say, in The United States v. Wilson, 7 Pet. 162: " As the power has been exercised from time immemorial by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance, we adopt their principles respecting the operation

and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it." We still think so, and that the language used in the constitution, conferring the power to grant reprieves and pardons, must be construed with reference to its meaning at the time of its adoption. At the time of our separation from Great Britain, that power had been exercised by the king, as the chief executive. Prior to the revolution, the colonies, being in effect under the laws of England, were accustomed to the exercise of it in the various forms, as they may be found in the English law books. They were, of course, to be applied as occasions occurred, and they constituted a part of the jurisprudence of Anglo-America. At the time of the adoption of the constitution, American statesmen were conversant with the laws of England, and familiar with the prerogatives exercised by the crown. Hence, when the words to grant pardons were used in the constitution, they conveyed to the mind the authority as exercised by the English crown, or by its representatives in the colonies. At that time both Englishmen and Americans attached the same meaning to the word pardon. In the convention which framed the constitution, no effort was made to define or change its meaning, although it was limited in cases of impeachment.

We must then give the word the same meaning as prevailed here and in England at the time it found a place in the constitution. This is in conformity with the principles laid down by this court in Cathcart v. Robinson, 5 Pet. 264, 280; and in Flavell's case, 8 Watts & Sargent, 197; Attorney-General's brief.

A pardon is said by Lork Coke to be a work of mercy, whereby the king, either before attainder, sentence or conviction, or after, forgiveth any crime, offence, punishment, execution, right, title, debt or duty, temporal or ecclesiastical, (3 Inst. 233.) And the king's coronation oath is, "that he will cause justice to be executed in mercy." It is frequently conditional, as he may extend his mercy upon what terms he pleases, and annex to his bounty a condition precedent or subsequent, on the performance of which the validity of the pardon will depend. (Co. Litt. 274, 276; 2 Hawkins Ch. 37, § 45; 4 Black. Com. 401.) And if the felon does not perform the condition of the pardon, it will be altogether void; and he may be brought to the bar and remanded, to suffer the punishment to which he was originally sentenced. Cole's case, Moore, 466; Bac. Abr., Pardon, E. In the case of Packer and others—Canadian prisoners—5 Meeson & Welsby, 32, Lord Abinger decided for the court, if the condition upon which alone the pardon was granted be void, the pardon

must also be void. If the condition were lawful, but the prisoner did not assent to it, nor submit to be transported, he cannot have the benefit of the pardon—or if, having assented to it, his assent be revocable, we must consider him to have retracted it by the application to be set at liberty; in which case he is equally unable to avail himself of the pardon.

But to the power of pardoning there are limitations. The king cannot, by any previous license, make an offence dispunishable which is *malum in se*, i. e. unlawful in itself, as being against the law of nature, or so far against the public good as to be indictable at common law. A grant of this kind would be against reason and the common good, and therefore void, (2 Hawk. C. 37, § 28.) So he cannot release a recognizance to keep the peace with another by name, and generally with other lieges of the king, because it is for the benefit and safety of all his subjects, (3 Inst. 238.) Nor, after suit has been brought in a popular action, can the king discharge the informer's part of the penalty, (3 Inst. 238;) and if the action be given to the party grieved, the king cannot discharge the same, (3 Inst. 237.) Nor can the king pardon for a common nuisance, because it would take away the means of compelling a redress of it, unless it be in a case where the fine is to the king, and not a forfeiture to the party grieved. Hawk. C. 37, § 33 ; 5 Chit. Burn. 2.

And this power to pardon has also been restrained by particular statutes. By the act of settlement, 12 & 13 Will. III. c. 2, Eng., no pardon under the great seal is pleadable to an impeachment by the Commons in Parliament, but after the articles of impeachment have been heard and determined, he may pardon. The provision in our constitution, excepting cases of impeachment out of the power of the President to pardon, was evidently taken from that statute, and is an improvement upon the same. Nor does the power to pardon in England extend to the *habeas corpus* act, 31 Car. II. c. 2, which makes it a *premunire* to send a subject to any prison out of England, &c., or beyond the seas, and further provides that any person so offending shall be incapable of the king's pardon. There are also pardons grantable as of common right, without any exercise of the king's discretion; as where a statute creating an offence, or enacting penalties for its future punishment, holds out a promise of immunity to accomplices to aid in the conviction of their associates. When accomplices do so voluntarily, they have a right absolutely to a pardon, 1 Chit. C. L. 766. Also, when, by the king's proclamation, they are promised immunity on discovering their accomplices and are the means of convicting them, Rudd's case, Cowp. 334; 1 Leach, 118. But except in these cases, accomplices, though admitted according to the usual phrase to be

"king's evidence," have no absolute claim or legal right to a pardon. But they have an equitable claim to pardon, if upon the trial a full and fair disclosure of the joint guilt of one of them and his associates is made. He cannot plead it in bar of an indictment for such offence, but he may use it to put off the trial, in order to give him time to apply for a pardon, (Rudd's case, Cowp. 331; 1 Leach, 115.) So, conditional pardons by the king do not permit transportation or exile as a commutable punishment, unless the same has been provided for by legislation. See 39 Eliz. c. 4 & 5 Geo. IV. c. 84, a consolidation of all the laws regulating the transportation of offenders from Great Britain.

Having shown, by the citation of many authorities, the king's power to grant conditional pardons, with the restraints upon the power, also when pardons for offences and crimes are grantable of course, and when a party has an equitable right to apply for a pardon, we now proceed to show, by the decisions of some of the courts of the States of this Union, that they have expressed opinions coincident with what has been stated to be the law of England, and more particularly how the pardoning power may be exercised in them by the governors of the States, whose constitutions have clauses giving to them the power to grant pardons, in terms identical with those used in the constitution of the United States.

In the constitution of the State of Pennsylvania, of 1790, it is declared in the 2d article, section 9, that the governor shall have power to remit fines and penalties, and grant reprieves and pardons, except in cases of impeachment.

Sargeant, Justice, said in Flavel's case, 8 Watts & Sergeant, 197; "several propositions were made in the convention which formed the constitution of 1838, to limit and control the exercise of the power of pardon by the executive, but they were overruled and the provision left as it stood." " Now, no principle is better settled than that for the definition of legal terms and construction of legal powers mentioned in our constitution and laws; we must resort to the common law when no act of assembly, or judicial interpretation, or settled usage, has altered their meaning."

Then proceeding to show the nature and application of conditions, the learned judge remarks: " And so may the king make a charter of pardon to a man of his life, upon condition. A pardon, therefore, being an act of such a nature as that by the common law it may be upon any condition, it has the same nature and operation in Pennsylvania, and it follows that the governor may annex to a pardon any condition, whether subsequent or precedent, not forbidden by law. And it lies upon the

grantee to perform the condition; or if the condition is not per-
formed, the original sentence remains in full vigor and may be
carried into effect."

To this case we add those of the State *v.* Smith, 1 Bailey's
S. C. Rep. 283, 288; also Addington's case, in the 2d volume of
the same reporter, p. 516; also Hunt, *ex parte;* also that of the
People *v.* Potter, N. Y. Legal Observer, 177; S. C. 1 Parker
Criminal Reports, 4; and the case of The United States *v.* Geo.
Wilson, 7 Pet. 150.

But it was urged by the counsel who represents the petitioner,
that the power to reprieve and pardon does not include the
power to grant a conditional pardon, the latter not having been
enumerated in the constitution as a distinct power. And he
cited the constitutions of several of the States, the legislation of
others, and two decisions, to show that when the power to com-
mute punishment had not been given in terms, that legislation
had authorized it; and that when that had not been done, that
the courts had decided against the commutation by the governors
of the States. And it was said, so far from the President hav-
ing such a power, that, as the grant was not in the constitution,
congress could not give it.

It not unfrequently happens in discussions upon the constitu-
tion, that an involuntary change is made in the words of it, or
in their order, from which, as they are used, there may be a
logical conclusion, though it be different from what the constitu-
tion is in fact. And even though the change may appear to be
equivalent, it will be found upon reflection not to convey the
full meaning of the words used in the constitution. This is an
example of it. The power as given is not to reprieve and par-
don, but that the President shall have power to grant reprieves
and pardons for offences against the United States, except in
cases of impeachment. The difference between the real lan-
guage and that used in the argument is material. The first
conveys only the idea of an absolute power as to the purpose or
object for which it is given. The real language of the constitu-
tion is general, that is, common to the class of pardons, or ex-
tending the power to pardon to all kinds of pardons known in
the law as such, whatever may be their denomination. We
have shown that a conditional pardon is one of them. A single
remark from the power to grant reprieves will illustrate the
point. That is not only to be used to delay a judicial sentence
when the President shall think the merits of the case, or some
cause connected with the offender, may require it, but it extends
also to cases *ex necessitate legis*, as where a female after convic-
tion is found to be *enceinte*, or where a convict becomes insane,
or is alleged to be so. Though the reprieve in either case pro-

duces delay in the execution of a sentence, the means to be used, to determine either of the two just mentioned, are clearly within the President's power to direct; and reprieves in such cases are different in their legal character, and different as to the causes which may induce the exercise of the power to reprieve.

In this view of the constitution, by giving to its words their proper meaning, the power to pardon conditionally is not one of inference at all, but one conferred in terms.

The mistake in the argument is, in considering an incident of the power to pardon the exercise of a new power, instead of its being a part of the power to pardon. We use the word incident as a legal term, meaning something appertaining to and necessarily depending upon another, which is termed the principal.

But admitting that to be so, it may be said, as the condition, when accepted, becomes a substitute for the sentence of the court, involving another punishment, the latter is substantially the exercise of a new power. But this is not so, for the power to offer a condition, without ability to enforce its acceptance, when accepted by the convict, is the substitution, by himself, of a lesser punishment than the law has imposed upon him, and he cannot complain if the law executes the choice he has made.

As to the suggestion that conditional pardons cannot be considered as being voluntarily accepted by convicts so as to be binding upon them, because they are made whilst under *duress per minas* and duress of imprisonment, it is only necessary to remark, that neither applies to this case, as the petitioner was legally in prison. "If a man be legally imprisoned, and either to procure his discharge, or on any other fair account, seal a bond or deed, this is not duress or imprisonment, and he is not at liberty to avoid it. And a man condemned to be hung cannot be permitted to escape the punishment altogether, by pleading that he had accepted his life by *duress per minas*." And if it be, further urged, as it was in the argument of this case, that no man can make himself a slave for life by convention, the answer is, that the petitioner had forfeited his life for crime, and had no liberty to part with.

We believe we have now noticed every point made in the argument by counsel on both sides, except that which deduces the President's power to grant a conditional pardon, from the local law of Maryland, of force in the District of Columbia. We do not think it necessary to discuss it, as we have shown that the President's power to do so exists under the constitution of the United States.

We are of opinion that the circuit court of the District of Columbia rightly refused the petitioner's application, and this court affirms it.

Mr. Justice Curtis and Mr. Justice Campbell dissented as to the jurisdiction, and Mr. Justice M'Lean from the judgment of the court.

Mr. Justice McLEAN dissenting.

William Wells was convicted of murder, in the District of Columbia, and sentenced to be hung on the 23d of April, 1852; on which day President Fillmore granted him a conditional pardon, for his acceptance, as follows : " The sentence of death is hereby commuted to imprisonment for life, in the penitentiary, at Washington." On the same day this pardon was accepted, as follows : " I hereby accept the above and within pardon, with condition annexed." This acceptance was signed by Wells, and witnessed by the jailer and warden. Wells now claims that the pardon is absolute and the condition null and void, and that, consequently, he is entitled to a discharge from imprisonment.

Application was made in this case to the circuit court of the District of Columbia by petition for a *habeas corpus*, and on the petition the following entry was made on the records of that court: " William Wells, who was convicted, in the circuit court of this District, of murder, and sentenced to be hung the 23d of April, 1852, which sentence was on that day commuted, by the President of the United States, to that of imprisonment for life in the penitentiary of the District, having been brought before that court on a writ of *habeas corpus*, the court, after hearing the arguments of counsel, and mature deliberation being thereupon had, do order that the said William Wells be remanded to the penitentiary, the court being of opinion that the President of the United States has the power to commute the sentence of death to that of imprisonment for life, in the penitentiary."

A petition for a *habeas corpus* to this court has been presented, and the case has been argued on its merits, and it is now before us for consideration.

This case is brought here, not as an original application, but in the nature of an appeal from the decision of the circuit court. It is not an appeal in form, but in effect, as it brings the same subject before us, with the decision of the circuit court on the *habeas corpus*, that the principles laid down by it may be considered.

In *ex parte* Watkins, 7 Peters, 568, the court say : " Upon this state of the facts several questions have arisen and been argued at the bar; and one, which is preliminary in its nature, at the suggestion of the court. This is, whether, under the circumstances of the case, the court possess jurisdiction to award the writ; and upon full consideration, we are of opinion that

the court do possess jurisdiction. The question turns upon this, whether it is an exercise of original or appellate jurisdiction? If it be the former, then, as the present is not one of the cases in which the constitution allows this court to exercise original jurisdiction, the writ must be denied. Marbury *v.* Madison, 1 Cranch, 137; 1 Peters's Condensed Rep. 267. If the latter, then it may be awarded, since the judiciary act of 1789, sec. 14, has clearly authorized the court to issue it.

"This was decided in the case *ex parte* Hamilton, 3 Dall. 17; *ex parte* Bollman & Swartwout, 4 Cranch, 75; and *ex parte* Kearney, 7 Whéat. 38. The doubt was, whether, in the actual case before the court, the jurisdiction sought to be exercised was not original, since it brought into question, not the validity of the original process of *capias ad satisfaciendum*, but the present right of detainer of the prisoner under it. Upon further reflection, however, the doubt has been removed."

In that case, this court "considered Watkins in custody under process awarded by the circuit court, and that whether he was rightfully so was the very question before the court; and if the court should remand the prisoner, it would clearly be the exercise of an appellate jurisdiction." The same remark applies with equal force and effect to the case before us.

In this case the question is, whether Wells is rightfully detained, under the order of the circuit court, in virtue of the commutation of the original sentence by the President, and which the circuit court has held to be a legal detention.

It is not perceived that there is any difference, in principle, between this case and the case of Watkins. This court has no power to revise, in this form, the judgment of the circuit court under the law in a criminal case; but, as in the case of Watkins, we may decide whether the individual is held by a legal custody.

It is said the convict is now in prison under the original sentence of the court. So far as that sentence goes, the man is presumed to have been hung in April, 1852. But it is insisted the President had power to reprieve from the sentence of death. This is admitted; but no reprieve has been granted. On the contrary, an act has been done, entirely inconsistent with a reprieve, as that only suspends the punishment for a fixed period. The punishment of death has been commuted, for confinement, to hard labor in the penitentiary during life. It is a perversion of the facts to say that Wells has been reprieved by the President; nor can it be said that he is now in confinement under a sentence of death. The sentence of death has been commuted for confinement. Since April, 1852, that sentence has been abrogated in effect; for, if the President had power to commute the crime, the sentence is at an end. The culprit is detained in

27*

prison under this commutation of the President, which the circuit court held he had the power to do, and remanded the prisoner on that ground; and whether this be legal, is the inquiry on the *habeas corpus*. It does not reach the original sentence of the court. That sentence is considered only as the ground of the commutation; and, if the President had no power to make it, the detention of Wells is illegal. Is not this a legitimate subject of inquiry on a *habeas corpus*? It has been held to be a legal detention by the circuit court, and this opinion of the circuit court is brought before us on the *habeas corpus*, as the only cause of detention.

The second section of the second article of the constitution of the United States declares, that " the President shall have power to grant reprieves and pardons for offences against the United States, except in cases of impeachments."

The meaning of the word pardon, as used in the constitution, has never come before this court for decision. It has often been decided in the States that the governor may grant conditional pardons by commuting the punishment. But in these cases the governor acted generally, if not uniformly, under special provisions in the constitution or laws of the State, or on the principles of the common law adopted by the State. This is the case in New York, Maryland, Ohio, and many other States.

It is argued by the attorney-general, that the word pardon was used, in the constitution, in reference to the construction given to it in England, from whence was derived our system of laws and practice; and that the powers exercised by the British sovereign under the term pardon is a construction necessarily adopted with the term. If this view be a sound one, it has the merit of novelty. The executive office in England and that of this country is so widely different, that doubts may be entertained whether it would be safe for a republican chief magistrate, who is the creature of the laws, to be influenced by the exercise of any leading power of the British sovereign. Their respective powers are as different in their origin as in their exercise. A safer rule of construction will be found in the nature and principles of our own government. Whilst the prerogatives of the crown are great, and occasionally, in English history, have been more than a match for the parliament, the President has no powers which are not given him by the constitution and laws of the country; and all his acts beyond these limits are null and void.

There is another consideration of paramount importance in regard to this question. We have under the federal government no common-law offences, nor common-law powers to punish in our courts; and the same may be said of our chief

magistrate. It would be strange indeed if our highest criminal courts should disclaim all common-law powers in the punishment of offences, whilst our President should claim and exercise such powers in pardoning convicts.

The power of commutation overrides the law and the judgments of courts. It substitutes a new, and, it may be, an undefined punishment for that which the law prescribes a specific penalty. It is, in fact, a suspension of the law, and substituting some other punishment which, to the executive, may seem to be more reasonable and proper. It is true the substituted punishment must be assented to by the convict; but the exercise of his judgment, under the circumstances, may be a very inadequate protection for his rights.

If the law controlled the exercise of this power, by authorizing solitary confinement for life, as a substitute for the punishment of death, and so of other offences, the power would be unobjectionable; the line of action would be certain, and abuses would be prevented. But where this power rests in the discretion of the executive, not only as to its exercise, but as to the degree and kind of punishment substituted, it does not seem to be a power fit to be exercised over a people subject only to the laws.

To speak of a contract, by a convict, to suffer a punishment not known to the law, nor authorized by it, is a strange language in a government of laws. Where the law sanctions such an arrangement, there can be no objection; but when the obligation to suffer arises only from the force of a contract, it is a singular instrument of executive power.

Who can foresee the excitements and convulsions which may arise in our future history. The struggle may be between a usurping executive and an incensed people. In such a struggle, this right, claimed by the executive, of substituting one punishment for another, under the pardoning power, may become dangerous to popular rights. It must be recollected that this power may be exercised, not only in capital cases, but also in misdemeanors, embracing all offences punished by the laws of congress. Banishment, or other modes of punishment, may be substituted and inflicted, at the discretion of the national executive. I cannot consent to the enlargement of executive power, acting upon the rights of individuals, which is not restrained and guided by positive law.

I have no doubt the President, under the power to pardon, may remit the penalty in part, but this consists in shortening the time of imprisonment, or reducing the amount of the fine, or in releasing entirely from the one or the other. This acts directly upon the sentence of the court, under the law, and is strictly an

exercise of the pardoning power in lessening the degree of punishment, called for by mistaken facts on the trial, or new ones which have since become known.

The case of the United States *v.* Wilson, 7 Pet. 150, has been referred to by the attorney-general, as sanctioning conditional pardons. But the remarks of the court in that case arose on the pleadings, and not on the power of the President. He had pardoned Wilson, but that pardon had not been pleaded, or brought before the court by motion or otherwise, and the court held that the pardon could not be considered, unless it was brought judicially before it. In that case the chief justice said : " The constitution gives to the President, in general terms, the power to grant reprieves, and pardons for offences against the United States."

And he says, " as this power has been exercised from time immemorial by the executive of that nation whose language is our language, and to whose judicial institutions ours bear a close resemblance, we adopt their principles, respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used by the person who would avail himself of it." And he goes on to show that a pardon, like any other defence, must be pleaded to enable the court to act upon it. There is nothing in the case which countenances the power of the President, as in this case is contended, to commute the punishment of death for confinement during life in the penitentiary. The chief justice said, " a pardon may be conditional," in reference to grants of pardon in England, and by governors of States.

There can be no doubt, where one punishment is substituted, under the laws of England, for another—as banishment for death—if the convict shall return, he may be arrested on the original offence ; and if he shall be found by a jury to be the identical person originally convicted, the penalty of death incurred by him may be inflicted. And the same thing may be done in regard to all offences where, in this country, the law authorizes the pardoning power to modify the punishment and give effect to the commutation.

In 4 Call. 35, in Virginia, a case is reported where the prisoner was indicted for felony. On motion of the attorney-general for an award of execution, the governor's pardon was pleaded, and urged as absolute, because the governor had no authority to annex the condition. The general court held that the condition was illegal, and therefore the pardon was absolute. Another case in North Carolina, reported in 4 Hawks. 193, the defendant was convicted of forgery, sentenced to the pillory, three years' imprisonment, thirty-nine lashes, and a fine of one

Ex parte: William Wells.

thousand dollars; execution issued for fine and costs; conditional pardon by the governor. The judge said, the governor cannot add or commute a punishment—it was consistent with his power to remit."

We are told that when a term is used in our constitution or statutes which is known at the common law, we look to that system for its meaning. Pardon is a word familiar in common-law proceedings, but it is not a term peculiar to such proceedings. It applies to the ordinary intercourse of men; and it means remission, forgiveness. It is said, in a monarchy, the offence is against the monarch, and that, consequently, he is the only proper person to forgive.

Bacon says, the power of pardoning is irreparably incident to the crown, and is a high prerogative of the king. And Comyns, in his digest, says: "The king, by his prerogative, may grant his pardon to all offenders attainted or convicted of a crime; and that statutes do not restrain the king's prerogative, but they are a caution for using it well."

The power to pardon is a prerogative power of the monarch, which cannot, it seems, be restrained by statute. Is this the usage or the common-law meaning of the word pardon, to which we are to refer as a guide in the present case? If the President can exercise the pardoning power, as free from restraints as the Queen of England, his prerogative is much greater than has been supposed. Instead of looking into the nature of our government, for the true meaning of terms vesting powers in the executive, are we to be instructed by studying the regalia of the crown of England; not to ascertain the definition of the word pardon, but to be assured what powers are exercised under it by the monarch of England. This is a new rule of construction of the constitutional powers of the President. I had thought he was the mere instrument of the law, and that the flowers of the crown of England did not ornament his brow.

In his commentary on the constitution, Judge Story says, 846: "The whole structure of our government is so entirely different, and the elements of which it is composed are so dissimilar from that of England, that no argument can be drawn from the practice of the latter, to assist us in a just arrangement of the executive authority."

It is not the meaning of the word pardon that is objected to; but it is the prerogative powers of the crown which are exercised under that designation. The President is the executive power in this country, as the Queen holds the executive authority in England. Are we to be instructed as to the extent of the executive power in this country, by looking into the exercise of the same power in England?

In the act for the better government of the navy of the United States, passed the 23d April, 1800, (2 Stats. at Large, p. 51, art. 42,) it is declared : " The President of the United States, or, when the trial takes place out of the United States, the commander of the fleet or squadron, shall possess full power to pardon any offence committed against these articles, after conviction, or to mitigate the punishment decreed by a court-martial."    If, in the opinion of congress, the power to pardon included the power to commute the punishment, this provision would seem to be unnecessary.

But admit that the power of the President to pardon is as great as are the prerogatives of the crown in England, still, the act before us is unsustainable.    The Queen of England cannot do what the President has done in this instance.    She has no power, except under statutes, to commute a punishment, to which the prisoner has been judicially sentenced, for any other punishment at her discretion.

By the act of George III. c. 140, it is provided, " that if his majesty shall be graciously pleased to extend his mercy to any offender liable to the punishment of death by the sentence of a naval court-martial, upon condition of transportation, or of transporting himself beyond seas, or upon condition of being imprisoned within any jail in Great Britain, or on condition of being kept to hard labor in any jail or house of correction, or penitentiary house, &c., it shall and may be lawful for any justice of the King's Bench, &c., upon such intention of mercy as aforesaid being notified in writing, to allow to such offender the benefit of such conditional pardon as shall be expressed in such notification.    And the judge is required to make an order in regard to the punishment, which is declared to be as effectual as if such punishment had been inflicted by the sentence of the court ; and the sentence of death was made to apply to such offender, should he escape."

And again, by the act of George IV. 21st June, 1824, it is provided, " when his majesty shall be pleased to extend his mercy, upon condition of transportation beyond seas, &c., one of his majesty's principal secretaries shall signify the same to the proper court, before which the offender has been convicted ; such court shall allow to such offender the benefit of a conditional pardon, and make an order for the immediate transportation of such offender.    And the act declares that any person found at large, who had been thus transported, should suffer death," &c.

Statute 28, 7 & 8 of George IV. § 13, declares that " when the king's majesty shall be pleased to extend his royal mercy to any offender, his royal sign-manual, countersigned by one of his

principal secretaries of state, shall grant to such offender a free or a conditional pardon," &c.

In 54 Geo. III. c. 146, where there was a conviction for high treason, the king was authorized to change the punishment—that said person shall not be hanged by the neck—but that instead thereof such person should be beheaded, &c.

It is laid down in Coke's 3d Institute, vol. 6, p. 52 : " Neither can the king by any warrant under the great seal alter the execution, otherwise than the judgment of the law doth direct." In the same book, p. 211, he says, " it is a maxim of law, that execution must be according to the judgment."

The sovereign of England, with all the prerogatives of the crown, in granting a conditional pardon, cannot substitute a punishment which the law does not authorize. The law authorizes the sovereign to transport, or inflict other punishments, for certain offences, and this being signified to some one or more of the judges, effect is given to the condition through his or their instrumentality. So that the punishment inflicted is matter of record. And should the offender return into England, after banishment, the law subjects him to punishment under the original conviction. Here is certainty in limiting on the one hand the discretion of the pardoning power, and on the other the rights of the culprit.

With very few, if any, exceptions, conditional pardons have not been granted by the governors of States, except where express authority has been given in the constitution or laws of the States. So early as the 12th of March, 1794, a law of New York provided " that it shall and may be lawful for the person administering the government of the State, for the time being, in all cases in which he is authorized by the constitution to grant pardons, to grant the same upon such conditions, and with such restrictions, and under such limitations, as he may think proper."

The distinguished attorney-general of the United States, Mr. Wirt, being called on for his opinion in a case differing from the present, but involving, to some extent, the same principles, in his letter of 4th January, 1820, to the Secretary of the Navy, says : " Your letter of the 30th ultimo submits, for my opinion, the power of the President to change the sentence of death, which has been passed by a general court-martial on William Bonsman, a private in the marine corps, into a sentence of " service and restraint for the space of one year, after which to cause him to be drummed from the marine corps as a disgrace to it."

He refers to the 42d article of the rules and regulations of the navy, which embrace the marine corps, and which declares that the President of the United States shall possess full power to

pardon any offence against these articles after conviction, or to mitigate the punishment decreed by a court-martial." And, he says, "the power of pardoning the offence does not, in my opinion, include the power of changing the punishment; but the "power to mitigate the punishment," decreed by a court-martial, cannot, I think, be fairly understood in any other sense than as meaning a power to substitute a milder punishment in the place of that decreed by the court-martial, in which sense it would justify the sentence which the President proposes to substitute, in the case under consideration."

The power of mitigation, he says, "in general terms, leaves the manner of performing this act of mercy to himself, and if it can be performed in no other way than by changing its species, the President has, in my opinion, the power of adopting this form of mitigation;" and he observes, "to deny him the power of changing the punishment in this instance, is to deny him the power of mitigating the severest of all punishments. Congress foresaw that there were cases in which the exercise of the power of entire pardon might be proper; they therefore, in the first branch of the article, gave him the power to pardon. But they foresaw also, that there would be cases in which it would be improper to pardon the offence entirely, in which there ought to be some punishment, but in which, nevertheless, it might be proper to inflict a milder punishment than that decreed by the court-martial; and hence, in another and distinct member of the article they give him, in general terms, the separate and distinct power of mitigation."

It will be seen that Mr. Wirt places the power of mitigation expressly under the article cited.

In a letter to the President on the power to pardon, dated 30th March, 1820, Mr. Wirt says: "The power of pardon, as given by the constitution, is the power of absolute and entire pardon. On the principle, however, that the greater power includes the less, I am of opinion that the power of pardoning absolutely includes the power of pardoning conditionally. There is, however," he says, "great danger lest a conditional pardon should operate as an absolute one, from the difficulty of enforcing the condition, or, in case of a breach of it, resorting to the original sentence of condemnation; which difficulty arises from the limited powers of the national government.

"But suppose," he remarks, "a pardon granted on a condition, to be executed by officers of the federal government—as, for example, to work on a public fortification—and suppose this condition violated by running away, where is the power of arrest, in these circumstances, given by any law of the United States? And suppose the arrest could be made, where is the

clause in any of our judiciary acts that authorizes a court to proceed in such a state of things? And without some positive legislative regulation on the subject, I know that some of our federal judges would not feel themselves at liberty to proceed, *de novo*, on the original case. It is true the king of England grants such conditional pardons by the common law; but the same common law has provided the mode of proceeding for a breach of the condition on the part of the culprit. We have no common law here, however, and hence arises the difficulty." And he says, "If a condition can be devised whose execution would be certain, I have no doubt that the President may pardon on such condition. All conditions precedent would be of this character; e. g., pardon to a military officer under sentence of death, on the previous condition of resigning his commission."

In his letter to the President, dated 18th September, 1845, Mr. Attorney-General Mason says: "I cannot doubt the power of the President to mitigate a sentence of dismission from the service, by commuting it into a suspension for a term of years, without pay. A dismission is a perpetual suspension without pay; and the limited suspension without pay is the inferior degree of the same punishment. The minor is contained in the major." And he says: "The sentence of death for murder could be mitigated by substituting any punishment which the law would authorize the court to inflict for manslaughter. This is the inferior degree of the offence."

And again, in his letter to the Secretary of the Navy, dated 16th of October, 1845, Mr. Mason says: "Did this power to mitigate the sentence include the power to commute or substitute another and a milder punishment for that decreed by the court, (referring to a court-martial,) the mitigation," he says, "must be of the punishment adjudged, by reducing and modifying its severity, except as in sentences of death, where there is no degree." He says: "At the war department it has always been considered that the executive has not the power, by way of mitigation, to substitute a different punishment for that inflicted by sentence of a court-martial—the general rule being that the mitigated sentence must be a part of the punishment decreed." He further remarks, "that in 1820, Mr. Wirt gave an opinion recognizing this rule, but made a substitution of a different punishment for the sentence of death an exception; and he places it on the ground that capital punishment can only be mitigated by a change of punishment." Mr. Attorney-General should have said, that the power given in the article to mitigate was referred to by Mr. Wirt as authorizing the mitigation, and not the general power to pardon.

No higher authority than Mr. Wirt can be found, as coming

from the law officer of the government. It gives to the procedure now before us no countenance or support, but throws the weight of his great name against the exercise of the power assumed.

But it is said, that the power of commutation may be exercised by the President under the laws of Maryland, adopted by congress on the cession of the territory which now constitutes the District of Columbia.

The constitution of Maryland provides, that the governor " alone may exercise all other the executive powers of government, where the concurrence of council is not required according to the laws of the State, and grant reprieves or pardons for any crime, except in cases where the law shall otherwise direct." This, I suppose, no one will contend, can be applied to the President of the United States. The constitutional provision is made subject to the action of the legislature.

A statute of Maryland was passed in 1847, c. 17, to make conditional pardons effectual. This law can only tend to show that there was no prior law by which such pardons could be made effectual.

The first law of Maryland on the subject of pardon was enacted in 1787. The first section provided, " that the governor may, in his discretion, grant to any offender capitally convicted a pardon, on condition contained therein, and is and shall be effectual as a condition according to the intent thereof."

The second section provides, if the convict be a slave, he may be transported out of the State, and sold for the benefit of the State.

The 4th sect. declares, if a party who has been pardoned on condition of leaving the State shall return contrary thereto, he shall be arrested, and on being found by a jury to be the same person, the court shall pass such judgment as the law requires for the crime committed.

The second law on the same subject, was enacted in 1795.

The 1st sect. requires the governor to issue a warrant to the sheriff, to carry the sentence of the court into effect. The 2d sect. that, in his discretion, the governor may commute or change any sentence or judgment of death into other punishment of such criminal of this State, upon such terms and conditions as he shall think expedient. And if a slave, he may be transported and sold for the benefit of the State.

By an act of congress of the 27th of February, 1801, it was declared, " that the laws of Maryland, as they now exist, shall be and continue in force in that part of the said district which was ceded by that State to the United States, and by them accepted." This provision covers what is now the District of Columbia.

That the general laws of Maryland for the punishment of offences, the practice of the courts, forms of actions, contracts, &c., come under the laws of Maryland, is undoubted. But the question is, whether the above laws which regulate pardons by the governor, apply to the President of the United States, in the exercise of the same power. After much reflection, I have come to the conclusion that they can neither justify nor control the exercise of the constitutional power of the President to grant a pardon, for the following reasons:—

1. Their language is inappropriate, and some of their provisions are inconsistent with the duties of the President. The governor is required to issue a warrant to execute the sentence of the court, and also to sell convicted slaves for the benefit of the State. Can the President do this?

2. For more than half a century these acts have not been applied to the President, although he has often granted pardons, until in the case now before us. Nor have either of the laws been referred to by any one of the attorney's general who have been consulted on the subject, and who have given elaborate opinions, and particularly Mr. Wirt, who dwells upon the difficulty, if not impracticability, of carrying out the condition on which the pardon was granted, without specific legislation. No reference was made to these laws by the late attorney-general, on whose advice the punishment of death was commuted, in favor of Wells, to imprisonment for life.

3. Any regulation respecting the high prerogative power to pardon or commute the punishment of a convict, must be general, and extend as far as the federal jurisdiction extends, and cannot be restricted by any act of congress to any particular State or territory. The power is given in the constitution, and it may be exercised commensurate with that fundamental law; and any modification of the power, to be exercised at the discretion of the President, must be coextensive with the constitutional power.

The 8th section of the 1st article of the constitution declares, that congress shall have power " to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof."

4. The above acts of Maryland can only operate in this case as acts of congress, and in that view they have been enacted more than fifty years, without being referred to or acted on during that period, although the subject of conditional pardon has been often discussed, and the want of provisions which they contain deeply felt and expressed. Under such circumstances,

is it possible to consider those acts, or either of them, as in force in this district since 1801? If this be so, it is the most extraordinary event that has occurred in the legal history of any country.

The laws adopted from Maryland were not specified by name; of course, those only which were local in their character, and were necessary in their nature to regulate local transactions, and the courts which settle controversies, were adopted. The laws which regulate the duty and powers of the governor, in regard to pardons granted to offenders, no more apply to the President than duties prescribed for the action of the governor in any other matter. This shows the reason why the above laws have been dormant, as if unknown, for more than fifty years. It is too late now to resuscitate them, however strongly the present exigency may call for them.

I am not opposed to commutation of punishment, where it may be called for by any great principle of justice or humanity; but the exercise of such power should be regulated by law, and not left to the discretion of the executive. As the law now stands, the punishment substituted, as well as the exercise of the power, rests upon discretion; and there is no legal mode of giving effect to the commutation; and this is an unanswerable objection to it. No court would execute the convict on the original sentence under such circumstances.

If the condition on which a pardon shall be granted be void, the pardon becomes absolute. This, I think, is a clear principle, although there may be found some opinions against it. The President has the power to pardon, and if he make the grant on an impossible condition—for a void condition may be considered of that character—the grant is valid.

The condition being void, I think Wells is illegally detained, and should be discharged.

Mr. Justice CURTIS dissenting.

In *Ex parte* Kaine, 14 How. 117, I examined, with care, the jurisdiction of this court to issue writs of *habeas corpus* to inquire into causes of commitment. I then came to the conclusion that the mere fact that a circuit court had examined the cause of commitment and refused to discharge the prisoner, did not enable this court, by a writ of *habeas corpus*, to reëxamine the same cause of commitment. Though subsequent reflection has confirmed the opinion then formed, I should have acquiesced in the jurisdiction assumed in this case, if a majority of the court, in Kane's case, had decided contrary to my opinion. But the question was then left undecided; and in this case, for the first time, in my judgment, has jurisdiction been assumed, on the

ground, not that the cause of commitment was originally examinable here—for that would be an exercise of original jurisdiction—but that, though not thus originally examinable, yet, as the circuit court has had the prisoner before it, and has remanded him, this court, by a writ of *habeas corpus*, may examine that decision and see whether it be erroneous or not.

That this is the only ground on which the jurisdiction over this case can be rested, or that it cannot be considered to be an examination of the original cause of commitment, will clearly appear, if we attend to what that cause of commitment was. The petitioner was convicted capitally. His sentence is not brought before us in form, but we must infer that it ordered him to be imprisoned until the day which was by the court, or should be by the executive, fixed for his execution. He received a conditional pardon. Regularly, I consider, that he should have been brought before the circuit court upon a writ of *habeas corpus*, and have there pleaded his pardon, in bar of so much of his sentence as directed him to be hung; or, in bar of the entire sentence, if the condition requiring him to continue in imprisonment for life was inoperative. United States *v.* Wilson, 7 Peters, 150. If this had been done, the circuit court would have pronounced its judgment upon the validity of such plea; and in conformity with the decision which that court has made in this case, it must have entered a judgment vacating its former sentence, and sentencing the petitioner to imprisonment during life in the penitentiary of this District.

Over such a sentence this court could have exercised no control, either by writ of error or of *habeas corpus.* Not by writ of error, for none is allowed in criminal cases. Not by *habeas corpus*, for, as was held in *ex parte* Watkins, 3 Pet. 193, a writ of *habeas corpus* cannot issue from this court to examine a criminal sentence of the circuit court, even where the objection to the sentence is, that it appears on the face of the record, in the opinion of this court, that the circuit court had not jurisdiction, and its proceeding was merely void; because the circuit courts are the final judges of their own jurisdiction; and of all their proceedings in criminal cases. This court has no power to reverse one of their criminal judgments for any cause, and consequently no power to form any judicial opinion upon the correctness thereof.

In the case before us, so far as appears, the petitioner did not formally plead his pardon, nor did the circuit court, by an entry on its records, formally vacate the capital sentence, and sentence the prisoner anew. But that court, using its own final judgment as to the proper mode of proceeding in this criminal case, proceeded in such manner and form as it deemed to be accord-

28 *

ing to law. It remanded the prisoner, in execution of the
original sentence, so far as that directed his imprisonment.
After this had been done, the imprisonment may be viewed in
one of two aspects. It may be considered as continued under
the original sentence; the execution of that part of the sentence
which commanded him to be hung being postponed by the par-
don, so long as there shall be no breach of the condition; or the
original sentence may be treated as modified by the proceedings
under the *habeas corpus* in the circuit court, and that part of
the sentence which commanded him to be hung, as annulled,
the residue remaining in force.

As I view this case, therefore, it stands thus: the petitioner
is imprisoned under a criminal sentence of the circuit court,
either as originally pronounced, or as modified by the order of
the circuit court made under the writ of *habeas corpus.* That
original or modified criminal sentence is the cause of his com-
mitment. Though this court has no jurisdiction by writ of
error to revise such a sentence, and has deliberately decided, in
*ex parte* Watkins, that a writ of *habeas corpus* cannot be made
a writ of error for such a purpose, yet by a writ of *habeas cor-
pus* we do revise such a sentence in this case.

It seems to me that the refusal of a writ of error in criminal
cases is not only idle, but mischievous, if a writ of *habeas corpus*,
which is certainly a very clumsy proceeding for the purpose,
may be resorted to, to bring the record of every criminal case,
of whatever kind, before this court.

With deference for the opinions of my brethren, in my judg-
ment, it goes very little way towards avoiding the difficulty to
hold that, before one under a criminal sentence of a circuit court
can thus attack his sentence collaterally, in a court which can-
not review it by any direct proceeding, he must first apply to
the circuit court for a writ of *habeas corpus;* and if the writ, or
his discharge under it, be refused, he may then bring into action
the appellate power of this court, and by a writ of *habeas corpus*
out of this court stop the execution of a sentence, which we have
no power to reverse. Few questions come before this court
which may affect the general course of justice more deeply than
questions of jurisdiction. This great remedial writ of *habeas
corpus,* so efficacious and prompt in its action, and so justly
valued in our country, may become an instrument to unsettle
the nicely adjusted lines of jurisdiction, and produce conflict and
disorder. If the true sphere of its action, and the precise limits
of the power to issue it, should become in any degree confused
or indistinct, serious consequences may follow—consequences
not only affecting the efficient administration of the criminal
laws of the United States, but the harmonious action of the

divided sovereignties by which our country is governed. For these reasons, though sensible of the bias, which, I suppose, every one has in favor of this process, I have heretofore felt, and now feel, constrained to examine with care the question of our jurisdiction to issue it; and being of opinion that this court has not power to inquire into the validity of the cause of commitment stated in this petition, I think it should be dismissed for that reason.

In this opinion Mr. Justice CAMPBELL concurs.