General David PARRISH, Petitioner,

v.

Donald W. WYRICK, Warden,
Respondent.

No. KCD 30533.

Missouri Court of Appeals,
Western District.

Oct. 1, 1979.

Motion for Rehearing and/or Transfer
Denied Oct. 29, 1979.

Application to Transfer Denied
Dec. 6, 1979.

Alex Bartlett, Duane E. Schreimann, Hendren & Andrae, Jefferson City, for petitioner.

John Ashcroft, Atty. Gen., Robert L. Presson, Asst. Atty. Gen., Jefferson City, for respondent.

Before WASSERSTROM, C. J., and SHANGLER, PRITCHARD, SWOFFORD, SOMERVILLE, CLARK and KENNEDY, JJ.

WASSERSTROM, Chief Judge.

Petitioner, by pro se application for writ of habeas corpus, sought his release from the Missouri State Penitentiary. This court issued its writ and appointed counsel for the petitioner. It is fitting to remark that appointed counsel have performed that assignment with a high degree of professional skill.

The issue made up by the pleadings and the briefs of the parties concerns the treatment which should be accorded to the "good time" which has accrued to petitioner's benefit. Petitioner argues that he is entitled to have all of that good time credited against his sentence, that after such credit his sentence has been fully served, and that he is therefore entitled to release. Respondent admits the accrual of all of the good time claimed, but he resists the conclusion that petitioner has any absolute right for said time to be credited against the sentence, and he argues instead that giving effect to such a credit lies within the complete discretion of the Governor.

Petitioner has experienced a tortuous, serpentine history of criminality and consequent litigation leading to his present situation. He entered the Missouri State Penitentiary on September 22, 1955, under sentences by the circuit court of the City of St. Louis on three charges of first degree robbery, the sentences being ten years on each charge, to run concurrently. On May 29, 1960, he escaped from the Penitentiary. Upon recapture he was charged with escape, two charges of robbery and two charges of auto theft. He pleaded guilty in the circuit court of Cole County and was sentenced to five years on the escape, five years on each charge of stealing and 25 years on each charge of robbery.

On December 15, 1962, petitioner completed the St. Louis sentences and started serving the Cole County sentences. However, on August 5, 1968, the Cole County sentences were set aside, the guilty pleas were withdrawn, and new guilty pleas were entered under which petitioner was sentenced to seven years on each robbery charge and two years on each of the other charges.

On April 9, 1970, petitioner pleaded guilty to first degree murder for the homicide of another inmate, and he received a life sentence. Shortly thereafter a declaratory judgment was entered on April 23, 1970, to the effect that the 1968 sentences were to be served consecutively. On December 11, 1972, another declaratory judgment was entered to the effect that petitioner should receive additional credit for jail time of five years, eight months and 27 days.

Thereafter on November 15, 1974, petitioner was allowed to withdraw his plea of guilty to the charge of first degree murder,

and he entered a plea of guilty to murder in the second degree on which a new sentence of ten years was entered. Then, on July 16, 1975, a judgment was entered in a proceeding under Rule 27.26 holding that the 1960 escape and theft convictions (as modified in 1962) were nullities, that the two robbery convictions had begun to run in 1962 and became completed May 10, 1973, and that the latter date marked the commencement of service by petitioner under the murder conviction.

By November, 1975, petitioner had accumulated credits for merit time, blood time and special time totaling 1,828 days, which if applied to his remaining sentence then being served would result in his release on November 6, 1975. The responsible officials in the Division of Corrections did so report to the Governor, but the Governor declined to issue an order of commutation of sentence.

Petitioner thereupon filed application for habeas corpus addressed to the circuit court of Cole County, but that petition was denied on November 24, 1975. However, petitioner was admitted to parole on May 24, 1976, under which he remained at liberty until June 7, 1978, when the parole was revoked.

Shortly thereafter petitioner again sought a writ of habeas corpus in the circuit court of Cole County, which was denied on September 6, 1978. That led to the institution of the present proceedings in this court on October 20, 1978.

I.

■ Respondent raises a threshold objection that the issue in this case has become moot. He points out that the new Missouri Criminal Code took effect on January 1, 1979, and that concurrently with the effective date of that new Code, the giving of all merit time has been discontinued. He points to the adoption of a new rule effective January 1, 1979, which provides: "Merit time will be discontinued for both inmates convicted of criminal acts prior to and after January 1, 1979." That regulation, supplementing the new concept of "conditional release" provided for in Sec. 558.011, subd. 4 of the Criminal Code, further provides that "Any person who shall serve $^7/_{12}$ths of the time he/she was sentenced to serve in an orderly and peaceful manner without a serious violation, as later defined, will be eligible for consideration for release by commutation on that date."

■ Respondent's argument in this respect is untenable. If petitioner's basic position is correct, then he had fully earned sufficient merit time in November, 1975, to be entitled to release. This release date would have been more than three years before the effective date of the new criminal code and the subsequent change in regulations. Those subsequent changes should not be permitted to operate so as to destroy a right which petitioner claims to have fully vested in 1975, if it did so vest. Of course, the fundamental question still remains to be answered, whether in fact petitioner did have a vested, protectable right to be released from confinement by reason of the accrued merit time.[1]

II.

"Good time" in Missouri has been of two kinds. The first category is the so called "three-fourths time" granted under Section 216.355, RSMo 1969.[2] The second category

---

1. Subsequent to the submission of this case, the Attorney General has furnished information that petitioner received a commutation of sentence by act of the Governor dated June 19, 1979. Based on that, the Attorney General asks that this proceeding be dismissed as moot. Although the commutation may solve petitioner's particular problem, the issue nevertheless is not moot because it is a matter of substantial public concern which is likely to recur and unless dealt with here could evade judicial re-

view. *O___ H___ v. French*, 504 S.W.2d 269 (Mo.App.1973); *State ex rel. Utility Consumers Council of Missouri, Inc., et al. v. Public Service Commission of Missouri et al.*, 585 S.W.2d 41 (Mo. banc 1979).

2. Section 216.355 was repealed by Laws 1977 which enacted the Criminal Code, effective January 1, 1979. The section as it stood prior to that date read in pertinent part as follows:

"1. Any person who is now or may hereafter be confined in any institution within the

of "good time" is set forth in administrative Rules and Regulations, and has been referred to in the administrative Rules and Regulations as "merit time." This merit time is subdivided into basic merit time, administrative awards and special merit time. That merit time could be awarded at a rate not to exceed a specified number of days per month.

At one time the administrative Rules and Regulations lumped together in legal theory the two categories just mentioned. Thus in the Inmate Informational Pamphlet—Rules and Procedures, dated September, 1967, it was stated: "Reduction of your sentence resulting from the three-fourths rule, institutional merit time, and blood time is a commutation of sentence." That statement was erroneous as regards the three-fourths rule, although it would have been correct in that respect under the Laws of Missouri as it existed a hundred years ago. Under the Laws of 1865–1866, the predecessor to Section 216.355, the statute provided: "when any persen [sic], imprisoned in the Penitentiary of the State of Missouri shall have, during the whole time of his or her imprisonment, behaved according to the rules and regulations of that institution, to the full satisfaction of the Inspectors, then the said Inspectors, on the expiration of three-fourths of the time for which such person was sentenced, shall write and sign a testimony to that effect and present the same to the Governor of Missouri, with a recommendation that such person be pardoned; * *."

However, the statute was amended in 1879 so as to provide what has existed in substantially the same form from that date until January 1, 1979. Under the 1879 amendment, good conduct by a prisoner no longer triggered merely a recommendation to the governor. Instead, the amendment provided that the inmate "shall be discharged in the same manner as if said convict had served the full time for which

division and who shall serve three-fourths of the time for which he was sentenced in an orderly and peaceable manner, without having any infraction of the rules or laws of the institution recorded against him, shall be dis-

sentenced, and *in such case no pardon from the governor shall be required.*" (Emphasis added.) See *Ex parte Collins*, 94 Mo. 22, 6 S.W. 345 (1887).

Thus between 1879 and 1979, prisoner release under the three-fourths rule was not done pursuant to the governor's power to pardon or commute sentence. Instead, the legal theory was that the three-fourths rule was referable to the legislature's power to define punishment for crime, and "the conditions of the three-fourths rule * * * must be read into every judgment of conviction. They offer a reward in the form of diminished incarceration to every convict for obedience to the rules of the prison and laws of the same." *Ex parte Rody*, 348 Mo. 1, 152 S.W.2d 657, 660 (banc 1941). As said in *Ex parte Carney*, 343 Mo. 556, 122 S.W.2d 888, 890 (banc 1938), these provisions "become a part of every judgment of conviction with as much effect as if actually written therein." See also *State v. Montgomery*, 223 S.W.2d 463 (Mo.1949).

The correct legal foundation for the three-fourths rule has been recognized by the more recent institutional rules and regulations. Thus, in Bulletin No. 45 (REVISED), adopted May 15, 1974, the director clearly distinguished between statutory three-fourths time and the additional institutional merit time, and that bulletin stated in part: "By statute each person is released after having served 9/12th of his sentence. In addition, each institution will submit a plan setting forth guidelines for the awarding of extra 'basic' merit time. * * * In addition to 9/12th statutory release and basic merit time, special merit time may be awarded for diligence in work and study and for productive participation in correctional treatment programs." The most recent rule effective January 1, 1979, is even more explicit on the subject when it states: "Inmates released on their 9/12th date or after will continue to be released

charged in the same manner as if he had served the full time for which sentenced. In such case no pardon from the governor shall be required."

under the signature of the director of the Division of Corrections and not through the commutation process."

█ In contrast to the legal basis for allowing statutory good time under the above three-fourths rule, the basis for granting nonstatutory merit time is completely different. The grant of nonstatutory good time has always been and continues to be a form of commutation under the governor's constitutional power to grant pardons or commutations.[3] *Whitaker v. State*, 451 S.W.2d 11 (Mo.1970) holds that commutation of sentence for good time falls within the authorization of that constitutional provision. Likewise, the more recent administrative rules and regulations spell out this same legal basis in unmistakable terms. So, the 1975 revision of Bulletin No. 45 provides: "Merit time is used as an objective standard in advising the Governor as to whether or not an inmate merits appropriate relief under the Governor's statutory [sic] power to grant reprieves, commutations and pardons." Further, the 1976 Inmate Rule Book defines Merit Time as: "time awarded to an inmate for satisfactory or outstanding conduct and work performance. The amount of time awarded shall be used as criteria for recommendation for commutation of sentence by the Governor." Even more pointedly, the 1976 published rules of the Division of Corrections said with respect to Merit Time: " . . . The amount of time awarded shall be used as criteria for recommendation for commutation of sentence by the Governor; but is in no way binding on the Governor. Commutation is a constitutional power and many factors must be taken into consideration in determining the actual release date of an inmate."

█ The power of commutation is a matter of grace resting purely within the discretion of the governor. *Whitaker v. State, supra; Ex parte Webbe*, 322 Mo. 859, 30 S.W.2d 612 (banc 1929); *Ex parte Reno*, 66 Mo. 266, 269 (1877). The case last cited holds: "a pardon or commutation is a mere matter of grace, and until this act of clemency is fully performed, neither benefit nor rights can be claimed under it."

█ Inasmuch as nonstatutory good time is granted under the power of commutation, that grant likewise rests within the sole discretion of the governor. *Whitaker v. State, supra; Ex parte Collins, supra.* The facts and ruling in the case last cited are particularly pertinent. In that case a prisoner had accrued sufficient good time to warrant his release.. However, that was under the old 1865–66 statute, by the terms of which the penitentiary officials merely certified those facts to the Governor and it was up to the Governor to give effect to the good time by way of a pardon. The penitentiary officials did certify the facts, but the Governor declined to issue a pardon. Thereupon the prisoner petitioned for habeas corpus. The Supreme Court held that the matter of release was purely within the discretion of the Governor and no relief could be granted by the court:

"The *status* of the petitioner, then, is that he, so far as in him lay, has fully complied with the condition annexed to his case, when he entered the walls of the penitentiary. It may be conceded that he became entitled to whatever benefit an observance of those conditions gave him; but what benefit was that? Simply this: that he became entitled to be recommended to the governor as a fit subject of pardon. This benefit he has received. His right to a *pardon* does not lie in the terms of the statute. * * * Equitably, the prisoner is perhaps entitled to his discharge; but that is a subject which lies entirely in the discretion of the executive. By virtue of the writ which has been issued, we can only make inquiry into *his legal* rights in the premises. The result is that he must be remanded to the custody of the warden, and it is thus ordered. (Emphasis in the original.)

---

3. Article 4, Section 7 of the Missouri Constitution of 1945 provides: "The governor shall have power to grant reprieves, commutations and pardons, after conviction, for all offenses except treason and cases of impeachment, upon such conditions and with such restrictions and limitations as he may deem proper * * *."

▓▓▓ To summarize, petitioner is absolutely entitled to credit for statutory good time under Section 216.355 which was in effect at the date he committed murder for which he is now serving time.[4] However, that entitlement does not avail him presently since his statutory three-fourths time will not expire until March 21, 1981. To obtain any earlier release as a matter of right, he must rely upon the accrual of nonstatutory good time; but as already shown, that nonstatutory time does not constitute an absolute credit which can constitute an automatic reduction of sentence. Accordingly, under the Missouri statutes and administrative rules, regulations and practices, he was not entitled to release in November, 1975, and he is not entitled to release now.

▓▓▓ The dissenting opinion offers two theories (neither of which was ever advocated by the able counsel for relator) upon which to say that relator has obtained an absolute right to the credit for merit time and therefore that he accrued an absolute right to immediate release. The first theory is that the Governor is bound upon contractual principles. One major trouble with this suggestion stems from Section 222.010, RSMo 1978, which suspends all civil rights of a convict during the term of his sentence. That statute disenables a penitentiary inmate from entering into any valid contract. *Jandro v. Jandro,* 246 S.W. 609 (Mo.App. 1923). Therefore, the contract postulated by the dissent would be void and unenforceable.[5]

Moreover, even if relator were legally competent to contract, the contract would be void for want of consideration. In obeying the rules of the penitentiary, relator would be doing only what he was already otherwise obligated to do. Missouri Digest, Contracts, ▓▓▓

The foregoing objections make it unnecessary to deal at any length with a still further problem: that is, whether the philosophy of prisoner rights should be extended to a pronouncement that management and supervision of the state's correctional institutions are to be subjected to a concept of a contractual relation between the inmates and the supervisory staff. Significantly, no existing authority has been cited so holding or even so suggesting.

The dissent's second theory is that relator was given a "conditional commutation" of sentence as soon as he entered the penitentiary or at least when he received a copy of the rule book. No authority is cited nor has any been found to support such a result. A commutation of sentence implies a present release from or modification of the sentence. If there is a condition imposed, that simply means that a breach of the condition will result in reinstatement of the original sentence in its full vigor. Whether conditional or unconditional, an effective commutation must act presently. If the supposed commutation does no more than promise to commute in the future, then we are back to the contract theory already discussed and which is subject to the fatal objections already pointed out. So the imaginative suggestion of a conditional commutation cannot avail anything to relator here.

The dissent endeavors to brush aside the opinion of the Missouri Supreme Court in *Ex parte Collins, supra,* on the ground that *Collins* is an old case decided in a bygone era in which a different philosophy prevailed as to prisoner rights. The Supreme Court may, if it so chooses, declare that the

---

4. Section 556.031, RSMo 1978, part of the new Criminal Code, provides that "any offense committed prior to January 1, 1979 * * * must be construed and punished according to the provisions of law existing at the time of the commission thereof in the same manner as if this code had not been enacted * * *."

5. In *Thompson v. Bond,* 421 F.Supp. 878 (D.C. Mo.1976) a federal three-judge court held Section 222.010 unconstitutional. However, the attack in that case focused on the right of

inmates of access to the courts, and there seems a serious question whether *Thompson* should be construed as declaring Section 222.-010 unconstitutional in any sense other than as it prohibits a convict to bring suit. In any event, this court is not bound by decisions of the lower federal courts, that being subject to acquiescence of the Missouri Supreme Court. *Hughes v. Dwyer,* 546 S.W.2d 733, 736 n. 1 (Mo.App.1977). See *Seales v. State,* 580 S.W.2d 733 (Mo. banc 1979).

philosophy of *Collins* is now obsolete and overrule it on that basis. This court, however, does not have that option.

### III.

Petitioner argues that respondent is guilty of "taking away" his merit time without notice and hearing and that such action deprives petitioner of his constitutional rights. In support of this argument petitioner relies on *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) in which it was held that no part of accumulated statutory good time may be disallowed by prison authorities, except in accordance with due process of law, which requires notice and hearing. The rule of *Wolff v. McDonnell* has no application here.

That rule has been more recently discussed by the United States Supreme Court in *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, —— U.S. ——, 99 S.Ct. 2100, 60 L.Ed.2d 668, decided May 29, 1979. *Greenholtz* holds that constitutional protection was accorded in *Wolff v. McDonnell* only because the Nebraska statute granting good time credits was intended to and did create "a liberty interest protected by due process guarantees." *Greenholtz* further emphasizes that each such statute has a unique status "and thus whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis."

■ In the present situation, unlike *Wolff v. McDonnell,* there is no statute at all granting the good time credit claimed. However, even if we assimilate the administrative rules and practices to a statute, it is plain that those rules and practices do not create a protectible entitlement. The reasons for that conclusion have already been fully discussed under part II of this opinion.

The writ of habeas corpus is quashed and the petitioner is remanded to the custody of the respondent.

PRITCHARD, SWOFFORD, SOMERVILLE and KENNEDY, JJ., concur.

SHANGLER, J., dissents in separate dissenting opinion, in which CLARK, J., concurs.

SHANGLER, Judge, dissenting.

The petitioner was set free from imprisonment by order of commutation of sentence entered on June 19, 1979. The official action was not reported to this court until *after* hearing on the habeas corpus petition, so opinion has issued. I agree that the proceeding was not made moot by the commutation but for the reason that others, still imprisoned, have cause to assert the efficacy of merit time earned by compliance with the directives of the prison administrators to reduce sentence. I dissent because the majority do not accord to merit time so earned an absolute reduction of sentence.[1]

The majority rests on the premise, simply, that the power to commute sentence rests by Constitution [Art. IV, § 7] altogether with the grace and discretion of the Governor unconditioned by an entitlement to a reduction of sentence earned under a promulgated administrative procedure. In summary, the opinion holds: "The grant of nonstatutory good time has always been and continues to be a form of commutation under the governor's constitutional power to grant pardons and commutations . . [and] does not constitute an absolute credit [and] automatic reduction of sentence." Implicit in this posture is the assumption that judicial interference with such a grace granted or withheld violates the constitutional separation of powers [Art. II, § 1] and so rests beyond the jurisdiction of a court to correct.

---

1. The habeas corpus petitioner Parrish contends, and respondent Wyrick admits by return, that petitioner has earned *1,828 days* of merit time which, if effective to reduce sentence, entitled him to release on November 6, *1975.* The report from the Department of Social Services to Governor Teasdale on the record of commutation certified by the Secretary of State shows, however, an accrual of *609 days* of merit time. We are given no accounting of this discrepancy. In any event, by whatever count, the prisoner has been eligible for commutation of sentence for more than a year before actual grant.

The conclusion of the majority, that administrative rules cannot compel an Executive commutation of sentence [*Whitaker v. State,* 451 S.W.2d 11 (Mo.1970)], however, can have no validity when the conditions for reduction of sentence are promulgations of the Executive, itself.

At least from year 1962, systematic provisions in the form of printed "Inmate Regulations" have issued from the successive prison administrators. These publications inform the convict population at the Missouri State Penitentiary for accrual of benefits, in addition to those under the statutory three-fourths rule, towards the reduction of sentence. This *good time* or *merit time* is designed as "reward for positive behavior which contributes to the achievement of correctional goals"—that is, to accomplish rehabilitation. [Bulletin No. 45 (Revised), May 15, 1974]. The year 1967 rule book makes the procedure explicit:

INSTITUTIONAL MERIT TIME:

In addition to the benefits of the statutory three-fourths rule, *an inmate may further reduce his sentence with good work and conduct* by earning institutional merit time. This time ranges from five days a month through eight days a month on assignments inside the penitentiary and from eight days a month through ten days on minimum-security assignments.

BLOOD TIME:

Over and above the statutory three-fourths rule and institutional merit time, *your sentence may be further reduced by donating blood* to the Red Cross . . . You may be credited with fifteen days for each regular blood you give up to a maximum of thirty days for a calendar year.

COMMUTATION OF SENTENCE BY GOVERNOR:

Reduction of your sentence resulting from the three-fourths rule, *institutional merit time, and blood time is a commutation of sentence.* It is commonly referred to as a discharge and is distinguished from parole. *It means that upon being commuted, you have finished that particular sentence* and you are not under supervision of any person or agency upon release to the community. [emphasis added].

These provisions in essential terms are repeated in the year 1970 rule book for the penitentiary. They propose good conduct and donation of blood as the *quid pro quo* for merit time and promise without condition reduction of sentence by commutation to the extent of the merit time so earned—unless forfeited. The early publications [Warden's Bulletins to Inmates and Personnel of July 1, 1968, and February 1, 1970, for instance] also make provision for forfeiture of merit time "by the Adjustment Board with the approval of the Warden." In May of 1974 and thereafter [no doubt prompted by the imperatives of *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)], the Director of Corrections [now Director of Division of Corrections] issued Bulletin No. 45 to modify the prior perfunctory procedure for forfeiture of merit time earned:

LOSS OF MERIT TIME: The courts have mandated that any loss of merit time must be by procedures which comport with constitutional due process, which includes:

1. Notification of the charges in writing.

2. Confrontation by the inmate of the allegation and accusors. [sic]

3. The right to call witnesses.

The classification/treatment teams shall be responsible for recommendations of merit time loss, and in no case shall merit time be recommended taken from any inmate without a meeting in which the inmate shall be permitted to fully discuss his position and present facts in his behalf . . . . .

The procedure was reannounced by formal rule published on December 31, 1975.

It is conceded that since year 1962 the Governor has granted formal commutation of sentence "[i]n more than 99 percent of the cases that have been submitted" upon notice from the Director of Corrections that a prisoner, by composite computation of statutory three-fourths time and institu-

tional merit time, has reached release date.[2] It is certain that no order to deny a commutation on merit time and statutory time was ever made by the incumbent or predecessor Governor. On this reckoning, the petitioner Parrish was placed by the Director of Corrections on the release list for November 6, 1975, his family gathered to receive him, but without explanation was never released.[3] Hence, the petition for writ of habeas corpus.

The majority opinion holds, nevertheless, that a commutation results only from a completed Executive clemency—a pardon signed, attested and delivered—and that no equity earned by a prisoner compliance with regulatory conditions for discharge can compel the discretion of the Executive to perform that act of grace. The legalism that only formality of the Executive signature suffices to complete a commutation yields to the reality of a bargain struck between the prisoner and Executive administrator, adopted by the Executive, and given effect by unvaried practice from one Executive to the next. I respond to the majority that, taken on its own terms, the circumstances show that the Executive has exercised discretion that merit time, not otherwise forfeited, shall work an absolute reduction of sentence towards commutation on fulfillment by a prisoner of the conditions precedent for good conduct, donation of blood, and other regimen for rehabilitation promulgated by penitentiary regulation. That is the reality of the undisputed circumstances. The regulations to the inmates were formulated and published by the Director of Corrections, appointed by the Governor and subject to his pleasure. [§ 216.110 as amended by the Omnibus Reorganization Act, Laws 1974, p. 530.] They had the dual public purpose to encourage "positive behavior" by a system of reward and at the same time to facilitate penal administration. They held out expectation without condition, that *reduction of your sentence* from merit time so earned *is a commutation of sentence.*[4] The incumbent Governor, as had each predecessor, adopted and affirmed the application by his administrator of the distinctive and intimate Executive power to commute as an expression of Executive policy. Thus, formal commutation of sentence has issued as of course on information referred by the prison administrator that a prisoner had accrued a sufficient statutory and merit time to earn release.

A power to pardon or commute, whether under constitution or statute, is construed in terms of the common law. Accordingly, the rules of construction as to deed or other grants apply to pardons and commutations. *Ex parte Wells,* 18 How. 307, 310, 15 L.Ed. 421 (U.S.1855); *United States v. Wilson,* 7 Pet. 150, 160, 8 L.Ed. 640 (U.S.1833). A pardon on condition, offered and accepted, in effect concludes a contract between the Executive and the prisoner that the Executive will release the prisoner on fulfillment of condition. *State v. Eby,* 170 Mo. 497, 71 S.W. 52, 60[3] (1902); *Ex parte Seymour,* 155 Tex.Cr.R. 112, 231 S.W.2d 448, 449[1] (1950); 67A C.J.S. Pardon and Parole §§ 25–27. On the same figurative principle,

---

**2.** There is no contention, in fact, that Executive commutation has *ever* been denied *any prisoner* [the petitioner now included] who has accumulated a sufficient statutory and merit time for release.

**3.** The commutation, of course, finally issued on June 19, 1979.

**4.** The year 1976 Inmate Rule Book, for the first time, propounds merit time, not in terms of absolute reduction of sentence, but as qualified by the possibility of refusal to commute by the Governor. Merit time, for the first time, becomes merely one criterion "for recommendation for commutation of sentence by the Governor." And for the first time a prison regulation explicitly informs the inmates that the administrative recommendation upon accrual of merit time "in no way bind[s] the Governor" who, in the commutation of sentence, exercises a constitutional power. In any event, no belated rule can abrogate the full right to commutation of sentence already fully earned by the petitioner Parrish or the *pro tanto* reduction of sentence earned by those other prisoners, similarly situated, under the previous regulations which gave unconditional reduction of sentence as an award for good conduct and blood donations—a procedure for the award of commutation adopted by the Governor as an instrument of Executive policy.

a condition of pardon must be construed according to the intention of the parties, and every doubt resolved in favor of the citizen and against the sovereignty. 60 A.L.R. 1410, Annotation: Conditional Pardon, p. 1414; 67A C.J.S. Pardon and Parole § 25.

A commutation may issue with condition or without condition. If on condition, then both the Executive and the convict are bound by that reservation. *Silvey v. Kaiser,* 173 S.W.2d 63, 64 (Mo. banc 1943); A pardon may reserve a condition precedent or a condition subsequent to the effective operation of commutation. *Ex parte Webbe,* 322 Mo. 859, 30 S.W.2d 612, 614[1–3] (banc 1929); Mo.Const. Art. IV, § 7 (1945). *The condition may be of any nature* so long as it is not illegal, immoral or impossible of performance. *State ex rel. Stewart v. Blair,* 356 Mo. 790, 203 S.W.2d 716, 718[2] (banc 1947). Although a matter of Executive grace, a commutation is subject to the election by the convict and does not come into effect until accepted with all attendant conditions. *Ex parte Strauss,* 320 Mo. 349, 7 S.W.2d 1000[1–4] (banc 1928); *United States v. Wilson,* supra, 7 Pet. l.c. 160. A condition subsequent of commutation that the prisoner "shall comply with all the rules and regulations of [the] Reformatory" is valid to bind a prisoner who assents. *Ex parte Webbe,* supra, 30 S.W.2d l.c. 615[2, 3]. The condition precedent that compliance by a prisoner with the institutional regulations earns merit time and entitlement to *pro tanto* reduction of sentence and the concurrent exercise of discretion to commute on those terms, by a parity of principle, binds the Executive to the expectation of release engendered by such an official practice. The lapse of an Executive signature on a paper when the right to the signature has fully accrued by acceptance and performance of condition becomes merely *functus officio.*

For these reasons I dissent to Part II of the majority opinion.

I dissent from Part III of the majority opinion as well. The refusal to give effect to the merit time earned in absolute reduction of sentence, without hearing or reason, denies the petitioner and those similarly situated due process of law. The majority dispatch that contention by the tautology that merit time earned under prison regulations prior to 1976 does not create "a liberty interest protected by due process guarantees." That conclusion proceeds readily from the premise of the majority that a formal act of clemency is required for commutation, that the act was never completed and that no equity can compel the Executive to complete that act of grace. That answer evades altogether the declaration of *Wolff v. McDonnell,* supra, that the loss of good-time credits lengthens confinement and so is a deprivation of liberty protected by due process. What has become of the merit time earned by the petitioner? The majority answer with an enigma [*Ex parte Collins,* 94 Mo. 22, 6 S.W. 345, 346 (1887)]:

> The *status* of the petitioner, then, is that he, so far as in him lay, has fully complied with the condition annexed to his case, when he entered the walls of the penitentiary. It may be conceded that he became entitled to whatever benefit an observance of those conditions gave him; but what benefit was that? Simply this: that he became entitled to be recommended to the governor as a fit subject of pardon. This benefit he has received. His right to a *pardon* does not lie in the terms of the statute . . . Equitably, the prisoner is perhaps entitled to his discharge; but that is a subject which lies entirely in the discretion of the executive. By virtue of the writ which has been issued, we can only make inquiry into *his legal* rights in the premises. The result is that he must be remanded to the custody of the warden, and it is thus ordered.

That principle was formulated at a time when prisoners were "mere slaves of the State" [*Ruffin v. Commonwealth,* 62 Va. 790, 794–6 (1871)] and before the due process of law ethic took account of infringement of convict rights from arbitrary action of the state. *Wolff v. McDonnell,* supra; *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Gagnon v.*

*Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). That was a time, also, when any civility to a convict—merit time included—was a matter of "grace." *Morales v. Schmidt,* 489 F.2d 1335, 1338 (7th Cir. 1973) modified on rehearing en banc, 494 F.2d 85 (1974). Merit time is no longer a grace, but a right. Time earned is time served—unless forfeited for reason, and is an interest in liberty protectible by due process. *Wolff v. McDonnell,* supra, 418 U.S. l.c. 571[28], 94 S.Ct. 2963.

The right of the petitioner, and those who stand with him, arises from regulations promulgated under the authority of statute [§ 216.405] by an Executive appointee. Thus, state action gives rise to the right to absolute reduction of sentence to the extent of merit time earned. Regulation before year 1976 also provided that the merit time so accrued could be lost only "by rules which comport with constitutional due process." Thus, state action also makes provision for forfeiture of merit time for cause shown. These procedures, without doubt, entitle the petitioner and those others to the expectation that their sentences would be reduced to the extent of the merit time earned and retained. They were rights and protections created—at least—by positive state authority and entitled to the due process of the law. *Meachum v. Fano,* 427 U.S. 215, 225[9], 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); See Note: Procedural Due Process In Prisoners' Rights, 57 B.U.L.Rev. 387 (1977). To deny commutation of sentence when that release has been earned without hearing or reason deprives a prisoner of a legitimate expectation of liberty. It also contradicts the governmental interest which prompted the regulations: orderly administration of the prisons on the one hand, and encouragement of prisoner behavior conducive to reinstatement into the community, on the other. That it is the Executive who must complete the commutation by formal act does not alter the nature of the expectation to reduction of sentence as a protectible right of liberty or avoid the due process obligation to a hearing to determine cause for the forfeiture of that expectation. The constitutional due process of law protects against *any* arbitrary action of government

to deny a right of liberty or property, no matter by what organ of government. *Missouri v. Dockery,* 191 U.S. 165, 171, 24 S.Ct. 53, 48 L.Ed. 133 (1903). That right to liberty or property—and thus the existence of a protectible interest—does not rest [as the majority has it] on any routine distinction between "grace" and "right" but on an entitlement to a benefit from state statute, regulation or other source. *Board of Regents v. Roth,* 408 U.S. 564, 571[9–11], 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Meachum v. Fano,* supra, 427 U.S. l.c. 226[9], 96 S.Ct. 2532; *Moody v. Daggett,* 429 U.S. 78, 86[1, 2], 97 S.Ct. 274, 50 L.Ed.2d 236 (1976). The case of *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* —— U.S. ——, 99 S.Ct. 2100, 60 L.Ed.2d 668 [1979] cited by the majority on Point III sustains the position of petitioner. That case holds, as the majority cites, "whether any . . . state statute provides a protectible entitlement must be decided on [that] basis." The very source for the right to absolute reduction of sentence time the petitioner claims is state regulations promulgated under authority of statute.

Part II of the majority opinion is wrong, even on the terms assumed, because the Executive exercised a *de facto* discretion to accord commutation in every case to a prisoner who fulfilled the conditions precedent of the regulations that good conduct earned merit time as an absolute reduction of sentence.

Part III of the majority opinion is wrong because the regulations promulgated by the administrator of the Executive under legislative authority and which, without qualification, accord to merit time earned an absolute reduction in sentence constitute state action which creates a legitimate expectancy of a benefit of liberty—a benefit which cannot be refused effect arbitrarily by the Executive organ of government without the hearing the very regulations direct.

For these reasons I dissent.