Moyer, C.J.,
concurring separately. I concur in the judgment and opinion of the majority that apply Section 11, Article III, Ohio Constitution and R.C. Chapter 2967 as clearly intended by the drafters of the Ohio Constitution and by the General Assembly. I write separately to discuss an aspect of the majority decision that demonstrates one of the very difficult responsibilities of being a judge.
The majority’s careful and restrained interpretation produces the only conclusion that is faithful to the words of the Constitution and to R.C. Chapter 2967. We are not required or even requested to review the wisdom or the judgment of the acts of Governor Celeste when he pardoned and commuted the sentences of the defendants two business days before he left office. If that were the issue, my vote would be to invalidate all of the Governor’s actions. That, however, is not the issue we are required to decide. Nor is there any dispute that even if the Governor were required by the Constitution and the statutes to receive a report from the Ohio Adult Parole Authority before granting a pardon or commutation, he could disregard the recommendation contained in the report and grant the pardon or commutation. Indeed, the manner in which Governor Celeste granted the commutations and pardon in the cases before us suggests that even if he had followed the statutory procedure, it is unlikely he would have followed a recommendation of the Adult Parole Authority that any of the defendants not be granted a commutation or pardon. It appears that that is precisely the reason the dissent advocates an amendment to the Constitution that would limit the power of the Governor to grant pardons, commutations, and reprieves beyond the limitations in Section 11, Article III. As Chief Justice Marshall observed, “[cjourts are the mere instruments of the law, and can will nothing.” Osborn v. Bank of United States (1824), 22 U.S. (9 Wheat.) 738, 866, 6 L.Ed. 204, 234.
*528 The majority opinion reflects the fundamental role of judicial responsibility and restraint. Every judge faithful to the judicial oath of office must be able to separate the law from his or her personal views when deciding cases. That fundamental aspect of judging is a unique challenge to judicial decision-making. In separating personal opinion from the constitutional issues before us, I am reminded of the observation that “[i]f the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be abandoned.” Home Bldg. & Loan Assn. v. Blaisdell (1934), 290 U.S. 398, 483, 54 S.Ct. 231, 256, 78 L.Ed. 413, 452 (Sutherland, J., dissenting). There is no comfort in applying the plain language of the Ohio Constitution to the facts in the case before us. The conduct of the death-penalty defendants that produced their convictions and death sentences is the lowest form of human behavior. If the death penalty is appropriate for anyone, it is appropriate for them. However, that personal belief has no relevance to the legal issues before us and must be separated from the judicial decision we are required to render. The words of the Constitution can be given their plain meaning only as applied by the majority decision. To analyze away the words of the Constitution is to engage in an act of corroborating one’s own belief that the Governor’s actions were unwise.
The distribution of power among the three branches of government rests on a delicate balance. It is a fundamental element of American government. S. Euclid v. Jemison (1986), 28 Ohio St.3d 157, 28 OBR 250, 503 N.E.2d 136. We are urged by the successor in the office of Governor to exercise our constitutional power to invalidate the commutations and a pardon of his predecessor in office. Restraint should characterize the exercise of judicial power in such a case. If we abandon the words of the Constitution as adopted by the citizens of Ohio in 1851, we invade both the authority of the executive branch and the will of the people.
For the foregoing reasons, I concur, albeit regretfully, in the per curiam opinion.
Alice Robie Resnick, J., concurring in part and dissenting in part.
I
By a stroke of a pen a Governor is authorized by today’s opinion to overturn the death penalty verdicts of judges and juries which have been upheld by countless state appellate judges, Supreme Court justices and federal court judges. Today’s per curiam opinion says it is perfectly acceptable for a Governor in the last days of his or her administration to grant commutations to whomever he or she desires without first awaiting the APA investigation and report. The basis of such a holding is that the Constitution does not specifically authorize regulations “as to the manner of applying for commutations.” As a result, only *529 full and absolute pardons are “subject to” any regulations enacted by the General Assembly.
The per curiam opinion misconstrues Section 11, Article III, and in the process engages in an inaccurate interpretation of the scope of the Governor’s pardoning power.[6] While I agree that the pardon purportedly granted by former Governor Celeste should be invalidated, it is clear to me that the commutations he purportedly granted also should fail for the very same reason advanced for the failure of the pardon.
The per curiam opinion proclaims that Section 11, Article III is unambiguous, and essentially ends its analysis of the “subject to” clause at that point. However, this case involves constitutional interpretation which is not readily resolvable by resort solely to hornbook rules of construction, as if in a vacuum, but must be considered with an eye on the historical context underlying Section 11, Article Ill’s evolution into its current form. The per curiam opinion, in focusing on a supposed semantical difference between pardons and commutations, does not grasp the importance of this historical development, and thereby fails to comprehend the entire scope of this issue. Section 11, Article III is certainly capable of more than one interpretation, and the reference to the “manner of applying for pardons” is not so clear as the per curiam opinion rashly presumes. Given that the constitutional provision is ambiguous, resort to constitutional history is not only appropriate, it is crucial. Even a cursory consideration of constitutional history reveals that the per curiam opinion is erroneous.
The drafters of Section 11, Article III were concerned with precisely the type of abuse of pardoning power which former Governor Celeste accomplished in his last days in office. As this case graphically illustrates, the power to commute is just as easily abused as is the power to pardon. Former Governor Celeste intentionally bypassed established procedures and flouted the constitutional limits on his clemency authority, ignoring the procedural safeguards the Constitution authorizes the General Assembly to put into place regarding the application process for executive clemency. Members of this court are unwilling to give effect to the binding statutory prerequisite for exercise of the clemency power, finding that an APA investigation and recommendation (along with the accompanying required notifications relating to victims’ rights) are conditions precedent for the Governor’s grant of a pardon, but that no APA involvement is necessary *530 for a commutation.[7]
This seems an especially curious result when one considers that both the pardon and the commutation are aspects of the Governor’s clemency power, which has as its source Section 11, Article III. Given the per curiam opinion, when the Governor considers whether to pardon an applicant for clemency, the Governor must wait until the APA process is complete before acting, but if the Governor contemplates a commutation, in the alternative, for that same applicant, the procedural investigation safeguards of the APA can be ignored. The near schizophrenic result engendered by the per curiam opinion makes the point better than any other argument that the Constitution does in fact authorize the General Assembly to regulate the application process for executive- clemency, and allows that body to require APA involvement to ensure that the Governor is able to make an informed clemency decision, whether the Governor is- considering a pardon or a commutation.
In order to underscore the magnitude of this case, a brief recapitulation of the circumstances of each defendant’s criminal conviction is in order and appropriate.
A
Donald Lee Maurer confessed to the killing of seven-year-old Dawn M. Hendershot. The evidence presented at trial revealed that on September 29, 1982, Maurer drove to a school in Massillon, Ohio, to pick up'his stepchildren and a few neighborhood children at the end of the school day. Dawn Hendershot was *531 the first to arrive. Rather than wait for the other children to appear, Maurer decided to depart alone with Dawn. Maurer drove Dawn out into the country to a wooded area, where he stopped the vehicle, removed a twelve-gauge shotgun, and led Dawn into the trees. He then-began to sexually molest the girl. At some point Maurer became frightened by his actions and attempted to strangle Dawn with her sweater. When she started to struggle, Maurer shot Dawn in the back, covered her lifeless body with twigs and leaves, and left the scene to return to his home.
A jury found Maurer guilty of aggravated murder with a specification, kidnapping, and gross sexual imposition. The trial court adopted the jury’s recommendation that the defendant be executed. His conviction and sentence were affirmed on direct appeal to the court of appeals and this court. See State v. Maurer (Feb. 13, 1984), Stark App. No. CA-6166, unreported, 1984 WL 4469, affirmed (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768. On January 10, 1991, former Governor Celeste purportedly commuted Donald Maurer’s death sentence to life imprisonment without parole eligibility.
B
Leonard Jenkins was convicted of aggravated murder with specifications, eight counts of robbery, one count of attempted murder and five counts of kidnapping. The convictions stemmed from a robbery that occurred in Cuyahoga County, Ohio, on October 21, 1981. Jenkins and another individual entered a branch office of National City Bank and held bank employees and patrons at gunpoint. During the robbery, Jenkins observed a police officer, Anthony Johnson, approach the front door of the bank and peer inside. Upon seeing the officer, Jenkins stated that he and his partner would have to shoot their way out of the bank. Officer Johnson was mortally injured by a gunshot to the head when Jenkins exited the bank and the two exchanged gunfire. A jury recommended and the trial court imposed a sentence of death. His conviction and sentence were affirmed on direct appeal to the court of appeals and to this court. See State v. Jenkins (Feb. 24, 1984), Cuyahoga App. No. 45231, unreported, 1984 WL 14150, affirmed (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264. On January 10, 1991, former Governor Celeste purportedly commuted Jenkins’s death sentence to life imprisonment without parole eligibility.
C
A jury convicted Debra Brown of the murder of fifteen-year-old Tonnie Storey. The evidence showed that on the morning of July 11, 1984, Tonnie left her home in Cincinnati to attend summer school. She was last seen on that day with a man identified as Alton Coleman and a woman matching Brown’s description. On *532 July 19, 1984, a realtor entered an abandoned building that he was preparing to show to a prospective buyer and found a partially decomposed body. Scrawled above the body on the wall were the words “I hate niggers death.” Police ultimately identified the body as that of Tonnie Storey. The evidence presented during trial included Brown’s fingerprints on a Michael Jackson button Tonnie had been wearing the day she disappeared. Brown admitted to another individual that she had killed Tonnie “for her clothes” and that she, Brown, “had to do what [she] had to do.” The state further introduced evidence linking Brown to at least five other murders and several other attempted murders or assaults. After finding Brown guilty of Tonnie’s murder, the jury recommended and the trial judge imposed a sentence of death. Her conviction and sentence were affirmed in a direct appeal to the court of appeals and to this court. See State v. Brown (Apr. 15, 1987), Hamilton App. No. C-850434, unreported, 1987 WL 9743, affirmed (1988), 38 Ohio St.3d 305, 528 N.E.2d 523. On January 10, 1991, former Governor Celeste purportedly commuted Brown’s death sentence to life imprisonment without parole eligibility.
D
On the morning of August 5, 1983, Willie Lee Jester entered an AmeriTrust Company branch office in Cleveland, Ohio, soon after it opened for the day. Jester approached Patrolman Benjamin Grair, the bank’s security guard, while he was sitting at a desk speaking on the telephone and shot him in the chest. Jester then ran to the bank counter, leaped over it, and took a total of $3,122 from a teller’s drawer. Patrolman Grair died as a result of the gunshot wound to his torso. The fatal injuries to his heart, right lung and liver were caused by a single, hollow-point bullet — a bullet specifically designed to cause more damage than a smooth-point bullet. Upon finding Jester guilty of aggravated murder with two specifications, the jury recommended and the trial court imposed a sentence of death. The conviction and sentence were affirmed in a direct appeal to the court of appeals and to this court. See State v. Jester (Sept. 26, 1985), Cuyahoga App. No. 49065, unreported, 1985 WL 8631, affirmed (1987), 32 Ohio St.3d 147, 512 N.E.2d 962. On January 10, 1991, former Governor Celeste purportedly commuted the death sentence to life imprisonment without parole eligibility.
E
A three-judge panel in Hamilton County convicted and sentenced Elizabeth Green to death for aggravated murder and to a consecutive term of ten to twenty-five years for aggravated robbery. The convictions stemmed from the killing and robbery of .Thomas Willis, a neighbor of one of Green’s friends, *533 Belinda Coulter. On January 4, 1988, Coulter sold Willis some food stamps so that she and Green could in turn use the cash to purchase drugs. Later that day, Green, with Coulter, entered Willis’s apartment wearing socks on her hands so as to avoid leaving any fingerprints. Green then stabbed Willis and took his money. Thomas Willis died as a result of one hundred nine knife wounds to his neck, torso and arms. Green admitted to a psychologist that she had participated in the attack but claimed she had stabbed Willis only three times. Green’s conviction and sentence of death were affirmed in a direct appeal to the court of appeals and to this court. See State v. Green (July 11, 1990), Hamilton App. No. C-880504, unreported, 1990 WL 95357, affirmed (1993), 66 Ohio St.3d 141, 609 N.E.2d 1253. On January 10, 1991, former Governor Celeste purportedly commuted Green’s death sentence to life imprisonment without parole eligibility.
F
A jury convicted Lee “Crazy Horse” Seiber of aggravated murder with three death penalty specifications in connection with the killing of Stanton Norris. On May 21, 1985, Seiber entered a Columbus bar for the second time that evening, carrying a loaded, cocked .38 caliber revolver. An accomplice stood at the closed front door, shotgun in hand, barring anyone from leaving. Seiber had returned to the bar to confront two men, Alvie and Louis Schoenberger, one of whom had criticized Seiber during his earlier visit for making lewd remarks to a woman in the bar. After forcing the brothers to lie face down on the floor and holding them at gunpoint, Seiber threatened the crowd and tried to find out who were friends of the Schoenbergers. Stanton Norris, who was drinking a beer at the bar, admitted to being a friend of the Schoenbergers. When Norris refused to comply with his order to lie face down on the floor, Seiber grabbed Norris by the shoulders and fatally shot him in the back. The jury recommended and the trial court imposed a sentence of death. Seiber’s conviction and sentence were affirmed on direct appeal to the court of appeals and to this court. See State v. Seiber (June 8, 1989), Franklin App. No. 87AP-530, unreported, 1989 WL 61733, affirmed (1990), 56 Ohio St.3d 4, 564 N.E.2d 408. On January 10, 1991, former Governor Celeste purportedly commuted the death sentence to life imprisonment without parole eligibility. (
G
Rosalie Grant was convicted by a jury of two counts of aggravated murder, each with two death penalty specifications, and one count of aggravated arson. The evidence presented at trial revealed that around 6:00 a.m. on April 1, 1983, a fire ignited in the bedroom of Grant’s two infant sons, one-year-old Donovan and two-year-old Joseph. The boys died in the fire as a result of severe burns and *534 smoke inhalation. Grant, however, escaped from the burning house entirely unharmed, fully dressed in pants, jacket, shoes and socks, with unsinged hair, no soot on her face or eyes, and free of any signs of smoke inhalation. Other than Grant’s claim that she had tried to save her babies when the smoke first awoke her, there was no evidence presented that Grant had attempted to put out the fire or to save the children. Arson investigators determined that the fire had been intentionally set and fueled by a liquid accelerant. No determination was made as to the exact type of accelerant that had been used. The evidence also revealed that approximately two weeks before the fire,. Grant had purchased $5,000 worth of life insurance for each of the boys with Grant listed as the beneficiary. Grant had not purchased a policy for herself or for her three-year-old daughter Shylene, who was living elsewhere. Furthermore, a can of charcoal lighter fluid, bearing Grant’s fingerprints, and a partially burned kitchen chair matching those in Grant’s home were found four days after the fire in a nearby vacant house. The conviction and sentence were affirmed on direct appeal to the court of appeals and to this court. See State v. Grant (Nov. 9, 1990), Mahoning App. No. 83 C.A. 144, unreported, 1990 WL 176825, affirmed, (1993), 67 Ohio St.3d 465, 620 N.E.2d 50. On January 10, 1991, former Governor Celeste purportedly commuted Grant’s death sentence to life imprisonment with no restriction as to parole eligibility.
H
According to the court of appeals’ opinion, in May 1979, Ralph F. DeLeo pled guilty to the murder of Dr. Walter Bond. After pleading guilty, DeLeo was immediately sentenced to an indefinite term of fifteen years to life imprisonment. In 1989, the court of appeals affirmed the trial court’s dismissal of DeLeo’s petition for enforcement of a plea bargain as to parole, or, in the alternative, a petition to vacate the conviction and sentence. See State v. DeLeo (Sept. 19, 1989), Franklin App. No. 89AP-107, unreported, 1989 WL 107559. On January 10, 1991, former Governor Celeste purportedly commuted DeLeo’s sentence to time served.
I
A jury convicted John Salim of felonious assault with violence and gun specifications in connection with an incident that occurred on January 23, 1988. The evidence, as set forth in the court of appeals’ opinion, showed that on that date Salim fired a gun at William Terbrack as the latter prepared to drive out of a hardware store parking lot. A bullet was retrieved from the window post on the passenger side of Terbrack’s car. Salim was sentenced to three years’ actual incarceration for the gun specification to be served prior to a three-to fifteen-year *535 term for felonious assault. The conviction and sentence were affirmed on appeal to the court of appeals. See State v. Salim (May 17, 1990), Cuyahoga App. Nos. 56925 and 57964, unreported, 1990 WL 66467. On January 10, 1991, former Governor Celeste purportedly granted Salim a full pardon.
As the above facts indicate, among those who purportedly received clemency from former Governor Celeste were some of the most notorious killers on death row. Celeste made the clemency decisions without awaiting the APA investigation and report. Yet, given the per curiam opinion, only the unfortunate John Salim, who supposed he had received a full pardon (as opposed to a commutation), must pay the price for Celeste’s wholesale disregard of the Constitution.
II
While I agree with the per curiam opinion that Section 11, Article III of the Ohio Constitution authorizes the General Assembly to prescribe procedural regulations as to the application process for executive clemency, my interpretation of Section 11, Article III convinces me that the authority granted by the “subject to” clause to regulate “the manner of applying for pardons” includes commutations. The per curiam opinion pays lip service to the history behind the evolution of current Section 11, Article III, without realizing the consequences of that evolution. A thoughtful analysis of the addition of the “subject to” requirement of the Ohio Constitution should include consideration of the reason that clause was added. The per curiam opinion fails to consider and put into effect the intention of the drafters of Section 11, Article III.
At the 1850-1851 Ohio Constitutional Convention, the debate on Section 11, Article III was limited to the so-called reporting requirement, the last sentence of Section 11, Article III. A delegate, Mr. Riddle, commenting on the insertion of the clause, stated: “It was known that the exercise of [the pardoning] power was much complained of. * * * [I]t was but too easy to excite the sympathies of men in behalf of the convicted criminal. Gentlemen of the committee were aware from their own experience that they had often put their names to papers soliciting reprieves and pardons on the representation of persons, in whom they had confidence. They knew also that persons in the same manner might influence the governor; and they further knew that on the strength of that influence brought to bear on him by the names of persons standing high in society he often exercised that power in instances in which the public could not see any propriety. The power, no doubt, had been abused, but when they looked into the entire matter they would find that no blame could be attached to the Governor.” 1 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio 1850-1851 (1851) 306-307.
*536 In choosing to alter its constitutional provision on executive clemency, Ohio adopted a provision remarkably similar to that incorporated by the state of New York into its Constitution of 1846.[8] Only a brief discussion of the New York debates is necessary to illustrate that Ohio’s drafters of Section 11, Article III must have been motivated by the same concerns as New York’s drafters when they decided to place restrictions on the Governor’s pardoning power. The recorded proceedings of the New York Constitutional Convention that authored the provision altering that state’s executive pardoning powers reveal that the provision was extensively debated. In particular, several amendments were offered relative to restrictions on the Governor’s pardoning power, including one, by a Mr. Chatfield, that would have greatly curtailed the Governor’s pardoning power by making it subject to “such restrictions as may be prescribed by law.” Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of New York (1846) 351. This Chatfield amendment ultimately was rejected, id. at 353, and the wording “subject to such regulations as may be provided by law relative to the manner of applying for pardons,” proposed by Mr. Taylor, was adopted. In support of his position, Mr. Taylor “agreed that there should be some conditions relative to the manner of applying the power, and he would offer an amendment to carry his idea out in relation to that. This would leave the Legislature to provide rules for its carrying out, leaving the exercise of the power entirely with the Governor.” Id. at 357.
Since the “subject to” clause of Section 11, Article III of the Ohio Constitution mirrors so closely the language of New York’s comparable section, it is fan to assume that the Ohio delegates of 1850-1851 shared New York’s concerns about abuses of the pardoning power, while also sharing the conviction of New York’s delegates that the Governor’s ultimate discretion to exercise the pardoning power should not be infringed. The “subject to” clause is a compromise which reflects those concerns.
*537 Ohio’s 1802 Constitution, in Section 5, Article II, gave the Governor “the power to grant reprieves and pardons.” No mention of commutations was included in this authorization. The word “commutations” was added in 1851 to Section 11, Article III at the Constitutional Convention of 1850-1851, which also added the “subject to” clause at the end of the same sentence.
“The terms ‘pardon’ and ‘reprieve’ have been adopted into the constitution of this state without defining or explaining them.” Sterling v. Drake (1876), 29 Ohio St. 457, 460. Just as “pardon” and “reprieve” are not defined in the Constitution, “commutation” also is not defined, so that we must look to the common law for its meaning. Although current statutes define these terms,[9] those statutory definitions do not necessarily control the consideration of their meanings in the Constitution.
In State ex rel. Gordon v. Zangerle (1940), 136 Ohio St. 371, 375, 16 O.O. 536, 538, 26 N.E.2d 190, 194, the court considered the “scope of the executive power” conferred by Section 11, Article III, determining that the common-law meaning of the terms “reprieves” and “commutations” are “not materially different” from the statutory definitions (which are the same today). Thus, the court noted, a reprieve was defined as “ ‘the temporary suspension by the Governor of the execution of a sentence,’[10] and commutation of sentence as ‘the substitution of a lesser for a greater punishment.’ ” (Footnote added.) Id.
*538 The Gordon court went on to consider the definition of “pardon” and the different forms of pardon:
“A pardon may be absolute or conditional, full or partial; and a conditional pardon may be granted upon conditions precedent or subsequent.
“A full pardon purges away all guilt and leaves the recipient from a legal standpoint, in the same condition as if the crime had never been committed (Knapp v. Thomas, 39 Ohio St., 377, 381, 48 Am.Rep. 462); a partial pardon releases from punishment without remission of guilt. Lee v. Murphy, 63 Va. (22 Gratt.), 789, 12 Am.Rep., 563. The essential characteristics of full and partial pardons are such that either may be granted with or without conditions. * * *
“An absolute pardon sets the accused free from the custody of the law, prevents further court action, terminates existing probation and makes anticipated probation impossible. * * *
“The power of executive pardon carries with it, as incidental thereto, the right to impose such valid conditions, precedent or subsequent, as the pardoning power may determine. * * * ” Gordon, 136 Ohio St. at 376-377, 16 O.O. at 538, 26 N.E.2d at 194.
The per curiam opinion appears to equate “pardon” with “full and unconditional pardon.” However, as the passage from Gordon illustrates, the word “pardon” encompasses several concepts. A “full and unconditional” pardon, which purges all guilt and places the recipient in the same position as if no crime had been committed, is only one subset of the several types of pardons. Another type of pardon, a “partial” pardon, which releases from punishment without remitting guilt, appears to be virtually synonymous with a “commutation,” which substitutes a lesser for a greater punishment, but does not remit guilt. Any definition of “pardon” which limits its meaning to clemency actions of the Governor that remit guilt is a narrow definition. While this narrow definition may appropriately be applied in some situations, the common-law meaning of “pardon,” when applied in the broader sense, also can easily encompass the concept of commutation, so that commutation is a subset of pardon.
*539 The per curiam opinion’s citation of State ex rel. Atty. Gen. v. Peters (1885), 43 Ohio St. 629, 4 N.E. 81, does not establish that pardons and commutations are in all cases mutually exclusive terms. In fact, the per curiam opinion includes the Peters definition of pardon among the material quoted from that case: “A pardon discharges the individual designated from all or some specified penal consequences of his crime. It may be full or partial, absolute or conditional.” (Emphasis added.) Id. at 650, 4 N.E. at 87. By the Peters definition, a partial pardon (which discharges the individual from “some * * * penal consequences of his crime”) is a pardon just as a “full and absolute pardon” is a pardon. The very language quoted belies the per curiam opinion’s conclusion. The constitutional meaning of “pardon,” as well as the common-law meaning of the word, is by no means precise. It is not possible, as the per curiam opinion attempts, to conclude that pardons and commutations are two totally distinct concepts. Recognition of the ambiguity in the word “pardon” instead leads to the conclusion that commutation is a subset of pardon when pardon is used in the inclusive sense, and that the “subject to” clause clearly does provide the authority to regulate commutations.
In this case, defendant Ralph DeLeo purportedly received a commutation to time served, while defendant John Salim purportedly received a full pardon. The per curiam opinion upholds DeLeo’s purported commutation, but invalidates Salim’s purported full pardon. Yet, under the definition of “pardon” set forth in Peters and in Gordon, what DeLeo purportedly received could just as easily be termed a partial pardon, in which case, presumably according to the per curiam opinion, Governor Celeste would have had to await the APA investigation and recommendation before granting clemency to time served. This point, as much as any other, belies the per curiam opinion’s assertion that the word “pardon” is used with precision throughout Section 11, Article III.
When Section 11, Article III was adopted in 1851 and the power of commutation was specifically mentioned as one of the Governor’s clemency powers, the delegates to the Constitutional Convention of 1850-1851 were either conferring a new power for the Governor to exercise, or they were explicitly conferring a power which had been implicit in the 1802 Constitution’s conferral of the power to grant pardons. If the delegates were conferring a new power, then it would be safe to assume that the power to grant commutations was considered to be something different from the power to grant pardons, and was not to be made subject to regulations “as to the manner of applying for pardons.” But if the delegates were confirming a power which already existed under the power to grant pardons, then it may be fairly concluded that the use of the phrase “as to the manner of applying for pardons” in the “subject to” clause was meant to include the commutation power. If the latter is the case, and if the word “pardon” is broad enough to encompass the word “commutation” in this way, then *540 Section 11, Article III uses “pardon” in two senses: in a limited way as one aspect of the clemency powers in the first clause of the first sentence of Section 11, Article III, and also, in the “subject to” clause, in an expansive way that includes the concept of “commutation.”
The records of the debates of the Ohio Constitutional Convention of 1850-1851 give no insight into why the “subject to” clause of Section 11, Article III uses the words “as to the manner of applying for pardons,” or into whether Section 5, Article II of the Ohio Constitution of 1802 conferred on Ohio’s Governor the power to commute sentences.
However, the discussions regarding the addition of the reporting requirement to the executive clemency provision of the Constitution at the 1850-1851 Constitutional Convention do reveal that many of the delegates indiscriminately used the term “pardon” to refer generically to the Governor’s clemency power.
One delegate, Mr. Riddle, stated that “[t]he [Executive Department] committee inserted that clause [the reporting requirement] into the report for the purpose, that the legislature at its annual or biennial sessions might know what the Governor had done during the vacation in the exercise of the pardoning power.” (Emphasis added.) 1 Debates and Proceedings, supra, at 306. Because the reporting requirement as proposed required the Governor to communicate “each case of reprieve, commutation, or pardon granted,” id. at 300,[11] Mr. Riddle thus used the inclusive term “pardoning power” to refer to the power to grant any type of executive clemency.
Similarly, another delegate, Mr. McCormick, thought that the provision requiring the Governor to report each reprieve, commutation, or pardon granted “required nothing to be communicated to the Legislature except the names of the persons pardoned. If men had interfered improperly in getting reprieves for criminals, there was nothing in that section as it now stood, which required the naming of the persons who interfered to obtain it * * *. The only object to be *541 gained by this section was the ascertainment of the number of prisoners pardoned * * *.” (Emphasis added.) Id. at 307. Mr. McCormick thus used the word “pardon” in a broad sense to refer to any act of executive clemency.
Another delegate, Mr. Stanton, opposed a proposal to further require the Governor to report the names of all persons who had applied for a reprieve, pardon or commutation. “He supposed that the latter part of the section was intended for the purpose of making the Governor accountable to the people for the exercise of the pardoning power, and to inform them whom he had pardoned.” (Emphasis added.) Id.
Yet another delegate, Mr. Larwill, stated that “[t]he Governor would no doubt have good reasons for exercising the pardoning power.” (Emphasis added.) Id.
These delegates’ statements persuasively refute defendants’ argument that the framers of Section 11, Article III used the word “pardon” in a narrow sense that did not include the concept of commutation. Many of the delegates at the Constitutional Convention of 1850-1851 used “pardoning power” to mean clemency power. Furthermore, the word “pardon” was used to refer to any executive exercise of the clemency power.
Not long after Ohio (in 1851) had amended its Constitution’s executive clemency provision to specifically include the power to grant commutations, the United States Supreme Court decided Ex parte Wells (1855), 59 U.S. (18 How.) 307, 15 L.Ed. 421. In the words of the court:
“The petitioner was convicted of murder in the District of Columbia, and sentenced to be hung [sic] on the 23d of April, 1852. President Fillmore granted to him a conditional pardon. The material part of it is as follows: ‘For divers good and sufficient reasons I have granted, and do hereby grant unto him, the said William Wells, a pardon of the offense of which he was convicted — upon condition that he be imprisoned during his natural life; that is, the sentence of death is hereby commuted to imprisonment for life * * *.’ ” Id. at 308, 15 L.Ed. at 423.
Wells petitioned for a writ of habeas corpus, pointing out that Section 2, Article II of the United States Constitution authorizes the President to grant pardons and reprieves, but does not explicitly authorize the President to place conditions upon a grant of pardon. Wells argued that Section 2, Article II authorizes only absolute pardons, and that since he had been pardoned under the authority conferred by that section, he must have received such an absolute pardon with a void condition, so that his sentence actually was remitted entirely. Id. at 309, 15 L.Ed. at 423. The Circuit Court of the District of Columbia refused the application, and the Supreme Court affirmed.
*542 The court in Ex parte Wells determined that the President’s power to grant “conditional pardons”[12] (commutations) was implicit within the power to grant “reprieves and pardons” conferred by Section 2, Article II of the United States Constitution. In so determining, the court found that the petitioner’s argument was mistaken, “arising from the want of due consideration of the legal meaning of the word pardon. It is supposed that it was meant to be used exclusively with reference to an absolute pardon, exempting a criminal from the punishment which the law inflicts for a crime he has committed.” 59 U.S. (18 How.) at 309,15 L.Ed. at 423.
The Ex parte Wells court determined that the word “pardon” is not so narrow as to include only an “absolute pardon”: “In the law it has different meanings, which were as well understood when the Constitution was made as any other legal word in the Constitution now is.” Id. at 310, 15 L.Ed. at 423. The court went on to state that “[i]n this view of the constitution, by giving to its words their proper meaning, the power to pardon conditionally is not one of inference at all, but one conferred in terms.
“The mistake in the argument is, in considering an incident of the power to pardon the exercise of a new power, instead of its being a part of the power to pardon.” Id. at 315, 15 L.Ed. at 425.
If the United States Supreme Court determined in 1855 that the President’s power to commute a sentence is implicit in the power to pardon, it is reasonable to assume that Ohio’s Governors operating under the authority of the state’s 1802 Constitution also had the implicit power to commute sentences, since the 1802 Ohio Constitution’s provision on executive clemency closely resembled that of the United States Constitution. The delegates to the 1850-1851 Constitutional Convention therefore did not add a totally new power to the Constitution by adding the word “commutations” in adopting Section 11, Article III, but affirmed *543 a power the Governor already possessed.[13]
It is apparent that the inclusion of “commutations” in the first line of Section 11, Article III as one of the Governor’s clemency powers was done to quiet doubt that the power to pardon was so limited that it did not include the power to commute. The meaning of “pardon” was not thereby magically altered into some precise word with only one connotation. The statements of the delegates to the 1850-1851 Constitutional Convention indicate the imprecision of the word “pardon.” In addition, R.C. 2967.01(B)’s provision that pardons may be “partial,” and the Peters and Gordon courts’ recognition of partial pardons, further demonstrate that a “full and absolute pardon” is only one type of pardon, and that there is an overlap between the generic sense of the word “pardon” and the concept of commutation. Thus, since the power of commutation can be understood to be contained within the power to pardon (in its broad sense) Section 11, Article Ill’s provision that the Governor’s power to commute (as well as to pardon) is “subject * * * to * * * regulations, as to the manner of applying for pardons” is broad enough to include regulations as to the manner of applying for commutations.
In short, even though the power to grant commutations may be a power distinct from the power to grant pardons, the common-law meaning of “pardon” included “commutation.” Section 11, Article III clearly subjects the Governor’s power to grant commutations, as well as the Governor’s pgwer to grant pardons, to authorized regulations. Hence the Governor’s power to grant commutations pursuant to Section 11, Article III is subject to regulations enacted by the General Assembly as to the application process.
Defendants argue that the omission of the word “commutations” from the “subject to” clause of Section 11, Article III reflects a conscious decision by the drafters to make only the manner of applying for pardons, and not commutations, subject to regulation. Defendants claim that a pardon, because it remits guilt as well as punishment so that'the recipient is in the same position as if no crime had been committed, is the ultimate act and was meant to be singled out. They further claim that a commutation, which merely reduces punishment without remitting guilt, is a lesser degree of clemency and so was intentionally left out of the “subject to” clause.
*544 Defendants’ reasoning is specious. Although a “full and unconditional” pardon is the ultimate pardon, whether a commutation differs greatly from a pardon is in the eye of the beholder. To the recipient of a full and unconditional pardon, that pardon is much different from a commutation (even a commutation to time served, which would also remit punishment) because the full pardon relieves the recipient of disabilities associated with the finding of guilt and wipes the record clean. However, to society as a whole, there is virtually no difference between a commutation to time served and a full pardon. As mentioned earlier, defendant DeLeo in this case was purportedly granted a commutation to time served, and defendant Salim was purportedly granted a full pardon, yet the action of Governor Celeste allowed both offenders to receive clemency despite the determination of guilt in the judicial system which led to the imposition of the original longer terms of punishment. Although some of the purported commutations in this case reduced a death sentence to life imprisonment without parole, and so did not effect the release of the recipients, commutations, like pardons, are very significant actions by the Governor. To permit a Governor in the last hours of his term to grant commutations without first applying to the APA would be a devastating blow in a day when victims’ rights are finally being recognized. One of the most important factors under R.C. Chapter 2967 is the requirement that at least three weeks before the APA recommends any pardon or commutation, notice of the pendency of the clemency application must be “sent to the prosecuting attorney and the judge of the court of common pleas of the county in which the indictment against the convict was found.” R.C. 2967.12. Additionally, under certain circumstances the APA must send a similar notice to the victim of the crime, or to a representative member of the victim’s family. R.C. 2967.12(B). There are very good reasons for these requirements. One is to avoid the shock the families of the victims would encounter when they first hear over the news that the sentences of the convicts who senselessly murdered their loved ones were commuted.
Lastly, the doctrine of expressio unius est exclusio alterius has no application regarding the “subject to” clause. Even though the words “commutation” and “pardon” appear together elsewhere three times in Section 11, Article III, the fact that the “subject to” clause does not specifically mention commutations does not require a narrow reading of the word “pardons” in that clause. It is readily apparent that the “subject to” clause was inserted into Section 11, Article III as a compromise to regulate the application process invoking the entire clemency power, and not just the power to grant pardons (with pardon used in its narrow sense). More significantly, consideration of the debates of the Ohio Constitutional Convention of 1850-1851 regarding the reporting requirement of Section 11, Article III makes it readily apparent that the drafters did not use the terms *545 “pardon” and “commutation” with the precision which would require a finding that “pardons” in the “subject to” clause does not include commutations.
Since the application process leading to the Governor’s grant of clemency was seen as subject to abuse, the drafters of Section 11, Article III allowed regulations to be prescribed to curb that abuse. Those regulations were authorized for the application process, whether initiated by the applicant (or someone on the applicant’s behalf) or by the Governor, but the power of the Governor to act is specifically exercised subject to the regulations. A Governor may in certain situations choose to grant only a commutation when the applicant may have applied for a full pardon. The interrelationship of the concepts of pardon and commutation cannot be ignored, an interrelationship obviously recognized by the reported statements of the delegates to the Ohio Constitutional Convention of 1850-1851. It is inconceivable that the omission of the word “commutation” from the “subject to” clause was intended to exclude commutations from regulation.
Ill
From the foregoing it is apparent that Section 11, Article III authorizes the General Assembly to regulate the application process for executive clemency, whether it is a pardon or a commutation which is being considered. I emphatically disagree with the per curiam opinion’s conclusion that Section 11, Article “III authorizes regulations only with respect to pardons, and not commutations. The per curiam opinion’s misguided attempt to sever the supposedly offending portions of R.C. 2967.07 is made necessary by its equally misguided conclusion that the Governor’s power to commute sentences is unfettered by the Constitution. R.C. 2967.07 is constitutional in toto, and makes APA involvement mandatory before the Governor may grant a pardon or a commutation.
In view of today’s decision it should become a top priority of the citizens of this state to ensure that such reckless behavior on the part of a Governor will not be repeated. It is ironic that the reasons for amending the Constitution today are similar to the reasons the 1850-1851 Constitutional Convention amended the Constitution of 1802. The delegates to the 1850-1851 Constitutional Convention felt the need to enumerate the Governor’s pardoning powers. Even though the 1802 Constitution did give the Governor power to commute, there remained a small degree of doubt (later put to rest by the United States Supreme Court in Ex parte Wells) that it did not, so the Ohio Constitution was amended to clarify the matter. In much the same way, it appears that our Constitution must be amended to specify that the manner of applying for clemency includes applications for commutations as well as for pardons. While it is clear to me that no such amendment should be necessary, a majority of this court do not agree. After this case, I am strongly convinced that it is time for the people of Ohio to *546 consider a constitutional amendment placing explicit and unavoidable limitations on the Governor’s clemency power (including the power to pardon and to commute, but not to reprieve), to go so far as to place specific limits on the Governor’s discretion in the use of the power. While I agree that the pardoning power is an indispensable aspect of our criminal justice system, the pardoning power is too important to be trusted with relatively few conditions to the unfettered whims of a lame duck Governor.
I would reverse the judgment of the court of appeals in case No. 93-1165 and reinstate the declaratory judgment of the trial court that the purported pardon and commutations are invalid.
Douglas and F.E. Sweeney, JJ., concur in the foregoing opinion.

. It is appropriate to refer to the Governor’s “pardoning power” synonymously with “clemency power.” The power to commute has historically been understood to be an aspect of the pardoning power. For a thorough discussion of the development and scope of the pardoning power of the President of the United States, see Hoffa v. Saxbe (D.D.C.1974), 378 F.Supp. 1221.

. With respect to the manner in which the Ohio Adult Parole Authority functions, the trial court found as follows:
‘When the APA receives a clemency application, the application is referred to the investigation section of the APA, which prepares a report on the details of the crimes, the applicant’s adjustment to prison or the community, and the support available to the applicant in the community. When the completed investigation report is received by the Parole Board, an initial vote is taken whether to immediately recommend against granting clemency or to conduct a hearing. If a hearing is to be conducted, notice is sent to the local Prosecutor, the sentencing Judge, and those victims or victims’ family members designated to receive notice by R.C. §§ [4943.041(A) ] and 2945.07(A), and as required by R.C. § 2967.12(A) and (B). These obviously interested individuals are then given the opportunity to submit comments to the APA on whether the applicant should receive clemency. Generally, these individuals are allowed three weeks’ time within which to respond to the APA notice. ’ At the hearing, consisting of a panel of at least a majority of the members of the Parole Board, the Board will consider the investigation, the microfiche records of the Ohio Department of Rehabilitation and Corrections, and the testimony of the applicant. After a vote is taken, a report is then prepared for the signature of the board members. See R.C. §§ 2967.07 and 2967.12. Usually, there is a two to three week delay after the vote is taken to circulate the recommendations among the voting Board members, who travel to each of Ohio’s 22 penal institutions attending hearings. After signature, the APA submits the written report to the Governor which includes a brief statement of the facts in the case, together with the recommendation of the APA. In such instances that an application is submitted directly to the Governor, it is still required to be channeled back through the APA review process pursuant to R.C. § 2967.07.”

. Section 5, Article IV of the New York Constitution of 1846 provided:
“The governor shall have the power to grant reprieves, commutations, and pardons after conviction, for all offenses except treason and cases of impeachment, upon such conditions and with such restrictions and limitations, as he may think proper, subject to such regulation as may be provided by law relative to the manner of applying for pardons. * * * He shall annually communicate to the legislature each case of reprieve, commutation, or pardon granted, stating the name of the convict, the crime of which he was convicted, the sentence and its date, and the date of the commutation, pardon or reprieve.” New York State Constitution Annotated (1938) 54.
When Ohio’s Constitutional Convention of 1850-1851 discussed the substance of what was to become Section 11, Article III of the Constitution of 1851, the Standing Committee on the Executive Department presented for debate a draft version on executive clemency which very closely resembled Section 5, Article IV of the New York Constitution of 1846. Por the language of this draft version, see 1 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio 1850-1851 (1851) 300. The text of the draft version is reproduced in footnote 11 of this opinion.

. R.C. 2967.01(B) provides:
“ ‘Pardon’ means the remission of penalty by the governor in accordance with the power vested in him by the constitution. Pardons may be granted after conviction and may be absolute and entire, or partial, and may be granted upon conditions precedent or subsequent.”
R.C. 2967.01(C) provides:
“ ‘Commutation’ or ‘commutation of sentence’ means the substitution by the governor of a lesser for a greater punishment. A sentence may be commuted without the consent of the convict, except when granted upon the acceptance and performance by the convict of conditions precedent. After commutation, the commuted sentence shall be the only one in existence. The commutation may be stated in terms of commuting from a named crime to a lesser included crime, in terms of commuting from a minimum and maximum sentence in months and years to a minimum and maximum sentence in months and years, or in terms of commuting from one definite sentence in months and years to a lesser definite sentence in months and years.”
R.C. 2967.01(D) provides:
“ ‘Reprieve’ means the temporary suspension by the governor of the execution of a sentence. A reprieve may be granted without the consent of and against the will of the convict.”

. I agree that reprieves do not fall within the broader meaning of “pardons.” Reprieves and pardons are recognized as being fundamentally different at common law because a reprieve is temporary. However, pardons and commutations are not recognized as fundamentally different at common law, but are interrelated concepts. Even though the power to grant reprieves often is said to come within the scope of the Governor’s pardoning power, a constitutional provision allowing procedural regulation of “the manner of applying for pardons” does not allow for regulation of the manner of applying for reprieves. Because of this fundamental difference between reprieves and pardons, Section 5, Article II of Ohio’s 1802 Constitution, and Section 2, Article II of the United *538 States Constitution each conferred upon the executive the power to grant both reprieves and pardons.
The General Assembly has recognized the fundamental difference between pardons and reprieves. R.C. 2967.08 provides that “[t]he governor may grant a reprieve for a definite time to a person under sentence of death, with or without notices or application.” This provision obviously recognizes the importance of prompt action in some reprieve cases and makes clear that procedural requirements need not be fulfilled before a reprieve may be granted. In addition, R.C. 2967.03, authorizing the Adult Parole Authority to recommend a pardon, commutation, or reprieve to the Governor, provides procedural requirements which must be fulfilled before the authority may recommend a pardon or commutation, but any such requirements regarding the recommendation of a reprieve are conspicuously absent.

. As reported by Mr. Leadbettér from the Standing Committee on the Executive Department, the provision later incorporated into the Constitution of 1851 as Section 11, Article III originally read:
“Sec. 11. The Governor shall have the power to grant reprieves, commutations and pardons after conviction, for all offenses, except treason, and cases of impeachment, upon such conditions, and such restrictions and limitations as he may think proper, subject to such regulations as may be provided by law, relative to the manner of applying for pardons. Upon conviction for treason, he shall have power to suspend the execution of the sentence, until the case shall be reported to the Legislature at its next meeting, when the Legislature shall either pardon, commute the sentence, direct the execution of the sentence, or grant a further reprieve. He shall annually communicate to the Legislature each case of reprieve, commutation, or pardon granted; stating the name of the convict, the crime for which he was convicted, the sentence and its date, and the date of the commutation, pardon or reprieve.” 1 Debates and Proceedings, supra, at 300.
The report of the Executive Committee reached its present form as Section 11, Article III after proposed amendments to the committee report were debated by the delegates and voted on.

. The court of appeals in the case sm6 judice went to some lengths to distinguish between a commutation and a conditional pardon, basing the distinction in part upon the necessity of acceptance by the recipient before a conditional pardon is valid. However, one major factor that separates the two is the attachment of a condition, which is what makes a conditional pardon “conditional.” In the same way that a pardon can have a condition attached, a commutation can also be subject to a condition. It is when the condition is attached that the recipient must consent before the conditional pardon or conditional commutation is effective. No consent is required when no condition is attached to the pardon or commutation. In re Victor (1877), 31 Ohio St. 206, paragraph three of the syllabus, recognized that in Ohio, a commutation is not the same as a conditional pardon, even though the Ex parte Wells court stated that it was for purposes of interpreting the United States Constitution. Since Victor presumed that a commutation is “for the culprit’s benefit,” no acceptance of an unconditional commutation is required for its validity. See 31 Ohio St 206, at paragraph three of the syllabus.

. One researcher has determined that the power to commute is implicit within the power to pardon:
“The [Ohio] Constitutional Convention of 1851 added the term ‘commutation’ to the pardon provision in present section 11 of Article III. However, the term ‘commutation,’ although not used in early constitutions, has long been interpreted as being included within pardon, and texts have often not disassociated the power to commute from the power to pardon.” 3 Ohio Constitutional Revision Commission 1970-1977, Proceedings & Research of the Legislative-Executive Committee (Mar. 31, 1972), Research Study No. 11.